# 2014-1205

# United States Court of Appeals
# for the Federal Circuit

PONANI SUKUMAR, an individual, and
SOUTHERN CALIFORNIA STROKE REHABILITATION ASSOCIATES, INC.,
a California corporation,

*Plaintiffs – Appellants,*

*v.*

NAUTILUS, INC., a Washington corporation,

*Defendant – Appellee.*

*Appeal from the United States District Court for the Western District of Virginia in Case No. 7:11-CV-00218, Senior Judge James C. Turk*

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS
_____

Steffen N. Johnson
Geoffrey P. Eaton
Winston & Strawn LLP
1700 K Street, N.W.
Washington, D.C. 20006
(202) 282-5000
sjohnson@winston.com
geaton@winston.com

Michael A. Tomasulo*
Winston & Strawn LLP
333 South Grand Avenue
38th Floor
Los Angeles, CA 90071
(312) 615-1700
mtomasulo@winston.com

*Attorneys for Plaintiffs-Appellants*

April 18, 2014

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rules 28(a)(1) and 47.4(a), counsel for Appellants Ponani Sukumar and Southern California Stroke Rehabilitation Associates, Inc., certifies the following:

1. The full name of every party or amicus represented by us is:

   Ponani Sukumar
   Southern California Stroke Rehabilitation Associates, Inc.,

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   N/A

3. All parent corporations and any publicly held companies that own 10% or more of the stock of any party represented by us are:

   N/A

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or expected to appear in this court are:
   Michael A. Tomasulo, Steffen N. Johnson, Geoffrey P. Eaton, (Winston & Strawn LLP); Lawrence R. LaPorte (Dickstein Shapiro LLP); James W. Jennings, F. Elizabeth Burgin Waller, William B. Poff (Woods Rogers PLC); Stephen J. Tomasulo, Whitney B. Kringel (Hill Farrer & Burrill LLP).

Dated: April 18, 2014                    /s/  Geoffrey P. Eaton

                                         Geoffrey P. Eaton
                                         Winston & Strawn LLP
                                         1700 K St. NW
                                         Washington, DC 20006
                                         (202) 282-5000
                                         geaton@winston.com

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ......................................................................v

STATEMENT OF RELATED CASES ......................................................ix

JURISDICTION..........................................................................................1

ISSUES PRESENTED.................................................................................1

INTRODUCTION .......................................................................................2

FACTUAL BACKGROUND ......................................................................8

   A. Sukumar develops plans for the production of custom fitness machines. ........................................................................................8

   B. Nautilus uses its patent markings to deter Sukumar's entry into the market, forcing Sukumar to explore costly work-arounds. ............9

   C. Sukumar discovers that Nautilus's machines are falsely marked and makes preparations to enter the exercise machine market. ...........14

STATEMENT OF THE CASE....................................................................15

   A. Plaintiffs file their false-marking lawsuit in California.................15

   B. The California district court transfers the case to the Western District of Virginia, thousands of miles from either party's state of residence. ........16

   C. Congress revises §292 to require "competitive injury."................17

   D. Plaintiffs file an Amended Complaint alleging competitive injury and adding state law claims.................................................................18

   E. Nautilus admits to falsely marking its machines, and Plaintiffs win partial summary judgment on the false-marking component of their claims.................................................................................18

   F. The district court grants summary judgment to Nautilus, holding that Plaintiffs cannot show cognizable injury or causation under any cause of action. ....................................................................19

SUMMARY OF ARGUMENT ............................................................... 20

STANDARD OF REVIEW ................................................................. 22

ARGUMENT .................................................................................. 23

I.   The Grant Of Summary Judgment On Plaintiffs' Federal False Marking
    Claim Must Be Reversed. .......................................................... 23

   A.  Plaintiffs provided evidence of precisely the kind of "competitive
      injury" that the amended §292 exists to prevent. ......................... 24

     1.  The plain meaning of "competitive injury" is just that—injury to a
        plaintiff's ability to compete with the false marker. ................. 24

     2.  Plaintiffs offered extensive evidence of precisely the kinds of
        competitive injury described in *Forest Group*. ......................... 29

   B.  Plaintiffs provided ample evidence of their intent and capability to
      compete with Nautilus. .............................................................. 32

   C.  In finding no triable issue of fact, the district court misinterpreted
      testimony, failed to consider corroborating evidence, and ignored the
      probative value of Plaintiffs' post-lawsuit actions. ...................... 37

     1.  The district court's assertion that Sukumar "admitted" a lack of
        intent to compete with Nautilus grossly distorts his testimony,
        which repeatedly expresses such intent. .................................... 38

     2.  The district court improperly disregarded Smith's corroborating
        declaration and extensive other evidence of Plaintiffs' efforts to
        enter the market. .................................................................. 40

   D.  The district court held Sukumar to an improperly restrictive
      "exclusive causation" standard, and improperly resolved a fact dispute
      as to the cause of Plaintiffs' injuries. .......................................... 44

     1.  The district court improperly required Sukumar to show that
        Nautilus's false marking was the "sole" cause of his competitive
        injury. ................................................................................. 45

     2.  Plaintiffs submitted extensive evidence to support their contention
        that Nautilus's false marking caused their competitive injuries. ...... 47

3. The district court improperly resolved genuine disputes of fact as to whether Nautilus's false marking caused Sukumar's competitive injury.............................................................................................49

II. Regardless of whether Plaintiffs Prevail On Their False-Marking Claims, The Summary Judgment Of Nonliability On Plaintiffs' State-Law Claims Must Be Reversed. ...............................................................52

A. Sukumar's evidence of harm to his "business or property" is sufficient to create a genuine fact dispute about his injury under state law..................53

B. Sukumar's evidence is sufficient to create a genuine dispute of fact about injury causation under state law. ..........................................55

1. The district court's "sole causation" standard has been expressly rejected by the California and Washington Supreme Courts..................56

2. Under the correct causation standards, Plaintiffs' evidence is sufficient to create a genuine dispute of material fact as to injury causation. ..................................................................57

III. On Remand, This Matter Should be Transferred Back to the Central District of California.......................................................58

A. Because this is no longer a *qui tam* suit, Plaintiffs' residence and choice of forum are entitled to substantial weight. ........................59

B. Contrary to Nautilus's conclusory assertions below, there are no material witnesses in the Western District of Virginia.................60

CONCLUSION ....................................................................63

ADDENDUM

12/06/2013 Judgment .............................................. A00001

12/06/2013 Memorandum Opinion Granting Summary Judgment ...A00002–29

05/09/2011 Order re Defendant's Motion to Transfer ......................A00030–38

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Anderson v. Liberty Lobby,*
   477 U.S. 242 (1986) ........................................................................22

*Ansell v. Green Acres Contracting Co., Inc.,*
   347 F.3d 515 (3d Cir. 2003) ...........................................................43

*Campbell v. Hewitt, Coleman & Assoc., Inc.,*
   21 F.3d 52 (4th Cir. 1994) ................................................................6

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,*
   576 F.3d 1348 (Fed. Cir. 2009) ......................................................24

*Clontech Labs., Inc. v. Invitrogen Corp.,*
   406 F.3d 1347 (Fed. Cir. 2005) ................................................ 23, 24

*Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.,*
   618 F.3d 1153 (10th Cir. 2010) ......................................................60

*Fisher–Price, Inc. v. Kids II, Inc.,*
   No. 10–CV–00988A(F), 2011 WL 6409665 (W.D.N.Y. Dec. 21, 2011)...........25

*Forest Grp., Inc. v. Bon Tool Co.,*
   590 F.3d 1295 (Fed. Cir. 2009) .............................................. *passim*

*Frolow v. Wilson Sporting Goods Co.,*
   710 F.3d 1303 (Fed. Cir. 2013) ................................................ 26, 57

*Greene v. Ab Coaster Holdings, Inc.,*
   2012 WL 4442749 (S.D. Ohio Sept. 25, 2012)...............................25

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982) ..................................................................... 5, 32

*Icon Health & Fitness, Inc. v. Nautilus Grp., Inc.,*
   No. 1:02 CV 109 TC, 2006 WL 753002 (D. Utah Mar. 23, 2006).......................9

*In re Omnicon Group Securities Litigation,*
   597 F.3d 501 (2d Cir. 2010) ...........................................................47

*In re Tobacco II Cases*,
  207 P.3d 20 (Cal. 2009) ....................................................................56

*In re TS Tech USA Corp.*,
  551 F.3d 1315 (Fed. Cir. 2008) .........................................................58

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*,
  170 P.3d 10 (Wash. 2007) .................................................................56

*Jones v. GNC Franchising, Inc.*,
  211 F.3d 495 (9th Cir. 2000) ...................................................... 58, 60

*Kwikset Corp. v. Superior Court*,
  246 P.3d 877 (Cal. 2011) ....................................................... 53, 54, 56

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  134 S. Ct. 1377 (2014) .....................................................................46

*Mason v. Mortg. Am. Inc.*,
  792 P.2d 142 (Wash. 1990) ...............................................................53

*Nordstrom, Inc. v. Tampourlos*,
  733 P.2d 208 (Wash. 1987) ...............................................................55

*Piper Aircraft Co. v. Reyno*,
  454 U.S. 235 (1981) .........................................................................59

*Prasco, LLC v. Medicis Pharms. Corp.*,
  537 F.3d 1329 (Fed. Cir. 2008) ................................................... 42, 43

*Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt, Inc.*,
  148 F.3d 1355 (Fed. Cir. 1998) .........................................................43

*S&A Farms v. Farms.com, Inc.*,
  862 F. Supp. 2d 898 (S.D. Iowa 2011) ...............................................46

*Seven-Up Co. v. Coca Cola Co.*,
  86 F.3d 1379 (5th Cir. 1996) ............................................................46

*Sukumar v. Direct Focus, Inc.*,
  349 F. App'x 163 (9th Cir. 2009) ......................................................13

*TriMed, Inc. v. Stryker Corp.*,
   608 F.3d 1333 (Fed. Cir. 2010) ..........................................................22

*United States v. Whaley*,
   786 F.2d 1229 (4th Cir. 1986) ...........................................................43

**Statutes**

7 U.S.C. § 25(a)(1) .............................................................................46

15 U.S.C. § 1127 ...............................................................................46

28 U.S.C. § 1295(a) ...........................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1338(a) ...........................................................................1

28 U.S.C. § 1367(a) ...........................................................................1

28 U.S.C. § 1404(a) ..........................................................................58

35 U.S.C. §292 ......................................................................... *passim*

Cal. Bus. & Prof. Code § 17200 .......................................................18

Cal. Bus. & Prof. Code § 17500 .......................................................18

Wash. Rev. Code §19.86.020 ............................................................18

Wash. Rev. Code §19.86.090 ............................................................53

**Rules**

Fed. R. Civ. P. 56(a) .........................................................................22

**Other Authorities**

10A Charles Alan Wright, Arthur R. Miller, et al.,
   *Federal Practice and Procedure* § 2725 (3d ed. West 2014) ..............22

15 Charles Alan Wright, Arthur R. Miller, et al.,
   *Federal Practice and Procedure*, § 3851 (4th ed. West 2014) ..................... 60, 61

157 Cong. Rec. S5319-5321 (daily ed. Sept. 6, 2011) (statement of Sen. Kyl)......17

*Black's Law Dictionary* 332 (9th ed. 2009).............................................................25

*Chisum on Patents* § 20.03[7][c][vii] (2009)..........................................................26

H.R. Rep. No. 112-98, pt. 1, at 53 (2011)........................................................ 17, 28

*Webster's Third New International Dictionary* 1937 (2002) .................................45

## STATEMENT OF RELATED CASES

No other appeal in or from this civil action is or was previously before this or any other appellate court.  Counsel is aware of no cases pending in this or any other court that will directly affect or be directly affected by the Court's decision in this appeal.

## JURISDICTION

The district court had jurisdiction over Plaintiffs' false-marking claim pursuant to 28 U.S.C. § 1331 (general federal question jurisdiction) and § 1338(a) (patent jurisdiction), and had supplemental jurisdiction over his state-law claims pursuant to 28 U.S.C. § 1367(a). The district court entered final judgment on December 6, 2013, and Plaintiffs timely filed their notice of appeal on January 3, 2014. This Court has appellate jurisdiction over all Plaintiffs' claims pursuant to 28 U.S.C. § 1295(a).

## ISSUES PRESENTED

Following transfer of the case from the Central District of California, where Plaintiffs reside and where the suit was originally filed, to the Western District of Virginia, the latter court granted summary judgment to Defendant-Appellee Nautilus, Inc. on both Plaintiffs' federal false-marking claim and their California and Washington state false-advertising and unfair-competition claims. The court held that Plaintiffs could not demonstrate either a cognizable injury or causation under any of those causes of action. The issues presented are:

With respect to Plaintiffs' false-marking claim,

1. Whether a potential competitor whose entry into the marketplace is deterred by the defendant's false marking, and who incurs substantial unnecessary expenses attempting to design around the falsely marked patents, has suf-

fered "competitive injury" "as a result" of the false marking, for purposes of

35 U.S.C. §292(b).

With respect to Plaintiffs' California and Washington unfair-competition and false-advertising claims,

2. Whether the district court erred in relying on its analysis of Plaintiffs' claim of "competitive injury" and causation under the false-marking statute to reject Plaintiffs' claims of injury under state law, where state law does not require a showing of "competitive injury," and where both the California and Washington Supreme Courts have expressly rejected the district court's exclusive-causation standard.

With respect to the Central District of California's order transferring the case,

3. Whether the order transferring the case to the Western District of Virginia was an abuse of discretion, where no party resides there, no injury occurred there, and Nautilus has failed to identify any defense witnesses in that jurisdiction with relevant and material information about the case.

## INTRODUCTION

This is a false-marking case in which false marking is not disputed: Nautilus **admits** that it falsely marked its exercise machines, in violation of 35 U.S.C. §292 and state unfair-competition laws. Instead, this dispute presents two important questions of first impression regarding Congress's 2011 amendment to the false-

marking statute:  First, under what circumstances can a *potential* competitor whose entry into the marketplace was deterred by the defendant's false patent marking demonstrate the "competitive injury" required by the statute?  And second, does the amended statute require the plaintiff to show that false marking was the "sole" or exclusive cause of his injuries?

Here, Plaintiffs offered sworn declarations, deposition testimony, and documentary evidence showing that Nautilus's admitted false-marking practices convinced Plaintiffs that they could not lawfully launch their competitive exercise-machine business.  Much of this evidence came from a former Nautilus employee.  Moreover, Nautilus's actions caused Plaintiffs to incur more than $450,000 of legal and business expenses in unsuccessful efforts to design around or otherwise avoid the falsely marked patents.  Nautilus introduced essentially no evidence to the contrary.

Nevertheless, the district court found on summary judgment that "no reasonable jury could find" that Plaintiffs' inability to enter the competitive marketplace and their payment of unnecessary expenses relating to the falsely marked patents "[were] a 'competitive injury'" for purposes of the revised statute.  A00019.  The court also found that Plaintiffs had failed to show that false marking was the "sole item" causing their injuries.  A00020.

Those conclusions were erroneous.  Under the plain text of the statute, Plain-tiffs have suffered a "competitive injury."  As this Court has recognized, where a false marker successfully "dissua[des]" a "potential competitor[ ]" from entering the marketplace, that is exactly the kind of injury the false-marking statute is intended to prevent.  *Forest Grp., Inc. v. Bon Tool Co.*, 590 F.3d 1295, 1302–03 (Fed. Cir. 2009).  Nautilus did just that.  Its behavior brought about the precise evil that Congress sought to combat—insulating itself from competition.  The resulting harm to Plaintiffs is a textbook example of "competitive injury."  To conclude otherwise would be to relieve from liability the *most effective* false markers—those who suppress competition completely.  If Nautilus, having admitted to falsely marking its machines, could avoid liability because its false marking practices were so successful, the statute would be eviscerated.

The same is true of the hundreds of thousands of dollars of expenses Plain-tiffs incurred in unsuccessfully attempting to avoid Nautilus's purported patent protection.  As this Court explained in *Forest Group*, being subjected to such "unnecessary investment[s] in design around" solutions to avoid the marked patents is a natural consequence of false marking: any potential competitor, faced with a rival's patent markings, will devote resources to investigating and evaluating the marked patents, and if necessary, to attempting to design around them.  *See id.* Those expenses are both a direct consequence of Nautilus's false markings and a

direct loss to Plaintiffs. They are a "competitive injury" squarely within the zone of harms that Congress intended to remedy in §292.

The district court also found insufficient proof that Plaintiffs (1) "intend[ed] to compete" in the relevant market in which Nautilus operates," or (2) were "able to compete (or actively trying to do so)." A00019, 23. Indeed, the court found *as fact* that Plaintiffs lacked any intention or ability to compete with Nautilus. But that finding is squarely contrary to the evidence.

As a threshold matter, "questions of subjective intent … rarely can be decided by summary judgment," *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)— especially where, as here, Plaintiffs' intention to compete is confirmed by corroborating declarations and deposition testimony. Plaintiff Sukumar's declaration describes discussions with then-Nautilus employee Frank Smith in which Sukumar expressed his intention to "design, prototype, manufacture, and sell fitness equipment using the core designs of Nautilus['s] 2ST and Next Generation" lines of machines. A00362. And Smith's declaration confirms those discussions, including Sukumar's statements identifying his "bona fide intention to design, build, and sell products for the senior fitness industry." A00482. At a minimum, this evidence was sufficient to create a genuine dispute of material fact precluding summary judgment—a disfavored resolution that is unavailable "unless the entire record shows a right to judgment *with such clarity as to leave no room for controversy*."

*Campbell v. Hewitt, Coleman & Assoc., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (emphasis added).

As to Plaintiffs' *ability* to compete, Plaintiffs offered evidence showing that they took numerous concrete steps toward launching their competitive enterprise, including:

- Acquiring more than 200 fitness machines from various manufacturers, at an aggregate cost of more than $1 million, for use in researching improved designs, A00372;

- Designing modifications to those machines rendering them suitable for use by the elderly or infirm, including a "breakaway arm" feature, "soft top stop" safety device, and improved ingress and egress, A00364;

- Subcontracting with exercise equipment manufacturers, including Sierra Pacific Co. and the Keiser Corporation, to produce prototypes of modified designs, A00483, 00496; and

- Retaining a major international law firm to investigate Nautilus's patent portfolio and investing $130,000 in multiple efforts to purchase a company affiliated with Nautilus, MedX, and any MedX patents and assets related to the exercise equipment at issue, A00416, 418–19.

Many of these product development and market-entry efforts are corroborated by Smith, a former Nautilus employee. And Nautilus offered *no* evidence whatsoev-

er, direct or indirect, tending to prove that Plaintiffs lacked the ability to enter the exercise-machine market. On the issue of ability to compete, as with intent, Plaintiffs' evidence was plainly sufficient to create a genuine dispute of material fact.

The district court's causation analysis is even more problematic. Under that analysis, Plaintiffs had to show that Nautilus's admittedly false markings were the "*sole item* holding [Plaintiffs] back" from "enter[ing] the market." A00020 (emphasis added). But nothing in §292, this Court's false-marking precedent, common-law causation standards, or common sense requires proof that the defendant's actions are the *exclusive* cause of injury. Indeed, if this were the applicable standard, no plaintiff would ever be able to sustain a false-marking claim: in the real world, myriad factors influence market entry. Under any fair causation standard, Plaintiffs' evidence easily creates a triable factual dispute.

The district court compounded these errors in holding that Plaintiffs' state-law claims fell with their federal claim. The court undertook no independent analysis of those claims. But Plaintiffs' state-law causes of action recognize and redress different (and broader) kinds of injury, and they embody different standards for determining injury and causation. Even if the district court had applied the amended federal law correctly—and it did not—it was error for the court to grant summary judgment to Nautilus on all four of Plaintiffs' legally distinct claims, having analyzed only the federal claim.

Finally, if the judgment below is reversed, the case should be remanded to the Central District of California, where it was originally filed. The only basis for the transfer to Virginia was Nautilus's conclusory assertion that over 20 material witnesses resided in Virginia—an assertion that proved to be false. Absent any connection to Virginia, this litigation belongs in the Central District of California, where both Plaintiffs reside and where their injuries occurred.

## FACTUAL BACKGROUND

### A. Sukumar develops plans for the production of custom fitness machines.

Ponani Sukumar is a Los Angeles businessman and engineer holding multiple engineering degrees and an MBA from the Wharton School of the University of Pennsylvania. After leaving his career as an investment banker, Sukumar became aware of business opportunities in the fitness market—in particular, the market's failure to offer exercise machines suitable for use by seniors. The genesis of his interest in the senior fitness industry was his father, who had become ill and had lost much of his strength, flexibility and ability move in 1994. From then on, Sukumar committed himself to developing a rehabilitative fitness program for his father.

Because Sukumar's father lost most of his "strength, flexibility and ability to move his limbs freely," Sukumar believed that strength training would be crucial to improving his father's health. A00362–63. However, most commercially availa-

-8-

ble fitness equipment presented serious issues with "ease of access into and egress from the machines, by users with limited strength and mobility, and safety features to prevent accidental injuries." A00363.

Sukumar identified certain machines produced by Nautilus, Inc.—the 2ST and NG lines—as having the most promising designs to be modified for use by seniors. Sukumar designed a "soft stop top" with a breakaway safety feature, as well as new seating surfaces designed to increase comfort, prevent injuries, and "mitigate aggravation of pre-existing pressure sores." A00363–64. He worked on "improving the ingress and egress characteristics of Nautilus' machines." *Id.* He also developed an idea for a machine that would allow a user to exercise while " lying supine on a table" or "sitting on a wheel chair." *Id.*

**B. Nautilus uses its patent markings to deter Sukumar's entry into the market, forcing Sukumar to explore costly work-arounds.**

Nautilus is no stranger to false marking. From at least 1998 to 2009, Nautilus systematically marked its machines with expired or inapplicable patents. *See* A00211–28. Because of its "deliberate and willful" actions, a federal court in Utah slapped Nautilus with the maximum fine of $325,000 for 650 occurrences of false marking. *Icon Health & Fitness, Inc. v. Nautilus Grp., Inc.*, No. 1:02 CV 109 TC, 2006 WL 753002 (D. Utah Mar. 23, 2006).

The patent label below, which appeared on commercial strength machines ("Strength Machines") between 2006 and 2009, is representative of Nautilus's patent labeling over the past two decades:



The only substantive change Nautilus made to Strength Machine labels between 1998 and 2009 was to add eight additional patent numbers to the labels. A00228. At least seven models of Strength Machines were not covered by any of the marked patents; at least eight patents on the patent labels were inapplicable to any Strength Machine; and several listed patents listed were inapplicable to most Strength Machines. A00192–94, 00201–03.

The motive for this extreme false marking is apparent from Nautilus's own SEC filings: "There are limited technological, manufacturing or marketing barriers to entry into the fitness-equipment markets…." A00354. The low barriers to entry make intellectual property particularly critical: patent protection, real or perceived, creates a substantial obstacle to would-be market entrants. Nautilus acknowledges

as much, informing its investors that "[i]f we do not or are unable to adequately protect our intellectual property, our sales and profitability could be adversely affected." A00351.

It is therefore unsurprising that upon learning of Sukumar's interest in the exercise-machine market in 1998, Nautilus representatives immediately warned him that Nautilus's machines were patented. A00364; *see also* A00496. Sukumar then met Frank Smith, a Nautilus sales representative, at a fitness-equipment tradeshow. While discussing Sukumar's design ideas, Smith reinforced the notion that Nautilus owned and vigorously protected a vast patent portfolio protecting the design of its machines. To drive the point home, Smith specifically showed Sukumar Nautilus machine labels listing many patents. A00364–65; *see also* A00480–81.

Sukumar knew the extent of his potential liability in a patent-infringement suit. A00366–67. Rather than risk that liability, he decided to work with Nautilus, commissioning the company to build a number of customized machines incorporating his ideas. A00364; *see also* A00481. Nautilus was late delivering Sukumar's machines, leading Sukumar to grow frustrated with the company. During the lengthy pendency of his order, Sukumar remained in contact with Nautilus's Smith, to whom he "explained … on multiple occasions – including during a fitness tradeshow in 1999 in San Diego – that [he] was seriously considering imple-

menting [his] modifications to Nautilus machines without the involvement of Nautilus." A00365; *see also* A00481. For a second time, Smith warned Sukumar that Nautilus machines were covered by patents and that Nautilus would aggressively protect its intellectual property. To reinforce the point, Smith again showed Sukumar Nautilus's patent labels. A00365; *see also* A00481.

It took years for Nautilus to deliver the custom products—Sukumar placed his order in 1998/1999 and did not receive his order until 2001/2002. A00364–65. To add insult to injury, Nautilus delivered non-conforming goods. A00365. Frustrated, Sukumar resumed his plans to produce custom machines based on Nautilus designs using Nautilus's 2ST and NG core designs as his template. A00365–66; *see also* A00481.

Sukumar again contacted Smith, who by 2002 had parted ways with Nautilus. After Sukumar shared his plans for customizing the 2ST and NG machines, Smith warned Sukumar for a third time the he could not make or sell any of his contemplated machines without a license to Nautilus's patents. A00365–66; *see also* A00481.

In light of Nautilus's history of aggressively defending its patent portfolio, Sukumar believed that obtaining a license to the marked patents was not only the "fair and prudent thing to do," but required. A00366. Thus, in July 2004, Sukumar sought to license the Nautilus patents "covering their 2ST and NG lines of

equipment," so as to "build, deploy, and sell exercise equipment based on Nautilus' core designs without infringing Nautilus' patents." A00369. Nautilus refused.

Sukumar then explored alternative options between 2004 and 2009 in order to realize his development plans. To further these efforts, he incorporated Southern California Stroke Rehabilitation Associates. His plans were largely put on hold, however, during contentious breach-of-contract litigation with Nautilus. Sukumar won his case in federal court in 2004. The ultimate disposition of the dispute, however, was not achieved until 2009. *Sukumar v. Direct Focus, Inc.*, 349 F. App'x 163 (9th Cir. 2009).

Chief among the alternatives Sukumar pursued was MedX Corporation, a manufacturer of premium exercise equipment. Plaintiffs purchased "a variety of MedX machines and retained consultants to modify them" to determine whether the "core designs of the MedX machines could serve as a 'next best' template for [his] machines." A00370–71. At one point during this time period, Sukumar explored the possibility of purchasing MedX. *Id.*; *see also* A00419 (listing $132,000 in damages from purchase of MedX machines). He directed his attorneys at Jones Day to investigate MedX's patent portfolio in order to assess MedX's value as a vehicle to break into the fitness-equipment manufacturing business in lieu of gaining access to Nautilus's 2ST and NG patent portfolios. A00371. Through this

process, Sukumar incurred substantial legal and storage fees.  A00371–72; *see also* A00386–93.

Finally, in 2009, Sukumar attempted to purchase patents and assets directly from Nautilus:  Sukumar understood "that Nautilus might be considering selling off certain of its assets, including various aspects of its commercial fitness lines," and directed his attorneys at Jones Day to "explore the possibility of purchasing Nautilus assets that would allow [him] a path to the Nautilus patents."  A00370. This ultimately fruitless endeavor added to the mounting costs to Sukumar and SCSRA.

During these times, Sukumar continued to monitor the patent markings on Nautilus machines, and noted that newer generations of Nautilus machines were marked with an expanding list of patent numbers.  *See* A00236–37.

## C. Sukumar discovers that Nautilus's machines are falsely marked and makes preparations to enter the exercise machine market.

In 2010, Plaintiffs became aware that the patents listed on Nautilus's machines might not actually cover the marked machines.  A00373.  By this point, Plaintiffs had spent more than $100,000 in their attempts to license or purchase Nautilus's patents or a suitable alternative (*e.g.*, MedX).  Plaintiffs filed this suit in October 2010 to obtain judicial confirmation that Nautilus's machines were not, in fact, covered by the marked patents.

During the pretrial proceedings, Nautilus *admitted* that it had been falsely marking its machines for at least five years. *See* A00158–60. In a February 2012 opinion, the district court granted summary judgment against Nautilus on the false marking issue. A00186–87.

Following that ruling, Sukumar immediately invested additional time, energy and resources to become a fitness-equipment manufacturer. Those investments included:

- Working with both overseas and domestic equipment designers and manufacturers to develop prototypes of a line of fitness machines, A00373–74;

- Retaining senior-health experts, engineers, and other industry professionals to develop protocols and fitness equipment for the senior population A00373–74, 00422; *see generally* A00424–77.

- Negotiating to build an 86,000 square foot facility for manufacturing fitness equipment. A00500, 00506.

## STATEMENT OF THE CASE

### A. Plaintiffs file their false-marking lawsuit in California.

On October 21, 2010, Plaintiffs brought suit in the United States District Court for the Central District of California, alleging violations of the false-marking statute, 35 U.S.C. §292 (b). At the time, §292 (b) provided a *qui tam* action, allow-

ing anyone—including those who had not suffered personal injury—to maintain a claim for false marking. Nonetheless, Plaintiffs explicitly alleged "competitive injuries" resulting from Nautilus's conduct, A00053, and prayed for "[r]ecovery adequate to compensate for the injuries that Sukumar and SCSRA have suffered because of Nautilus's false markings." A00083.

### B. The California district court transfers the case to the Western District of Virginia, thousands of miles from either party's state of residence.

Nautilus was served with Plaintiffs' Complaint on October 21, 2010. Nautilus filed an Answer and participated in discovery in the Central District of California. Nevertheless, five full months after the Complaint was served, Nautilus moved to transfer the case to the Western District of Virginia, 2,500 miles from Plaintiffs' home district in California and more than 2,700 miles from Nautilus's home district in Washington state. Plaintiffs opposed the transfer, highlighting the prejudicial delay that the transfer would cause and speculative nature of Nautilus's only substantive argument in favor of transfer—its assertion that multiple witnesses resided in Virginia who *might* have information material to the case. A00136–43. On that tenuous basis, the California district court granted Nautilus's motion in May 2011. A00030–38. Following transfer, discovery quickly revealed what Plaintiffs had maintained all along: the majority of the 21 purported Virginia witnesses were merely line workers, none of whom had any knowledge relevant to the case. A00229–30, 00271–72.

## C. Congress revises §292 to require "competitive injury."

In 2011, Congress revised the false-marking statute to eliminate its *qui tam* provisions and add a requirement that plaintiffs show "competitive injury" occurring "as a result of" a defendant's false marking. Section 292(b) now states: "A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury." 35 U.S.C. §292 (b) (2011).

The revisions to §292 resulted from Congress's perception that its *qui tam* provisions were being abused. One senator, for example, explained that under the old statute lawsuits were "often brought by parties asserting no actual competitive injury from the marking," and were often "brought by patent lawyers themselves claiming the right to enforce a fine of $500 for every falsely marked product." 157 Cong. Rec. S5319-5321 (daily ed. Sept. 6, 2011) (statement of Sen. Kyl). By requiring potential plaintiffs to show "competitive injury," Congress narrowed the cause of action to include only those who can demonstrate "actual injuries that they have suffered as a result of false marking." H.R. Rep. No. 112-98, pt. 1, at 53 (2011). As the district court put it, "the amendment was intended to eliminate plaintiffs with no connection to the false marking." A00013.

### D. Plaintiffs file an Amended Complaint alleging competitive injury and adding state law claims.

Following transfer, Plaintiffs filed an Amended Complaint that again alleged "competitive injury," added additional factual allegations supporting the existence of such injury, and further alleged violations of California's unfair-competition and false-advertising laws, Cal. Bus. & Prof. Code §§ 17200, 17500, and Washington state's consumer-protection statute, Wash. Rev. Code §19.86.020.

### E. Nautilus admits to falsely marking its machines, and Plaintiffs win partial summary judgment on the false-marking component of their claims.

In 2012, the district court granted Plaintiffs partial summary judgment on their false-marking, false-advertising, and unfair-competition claims. The district court explained that "Nautilus falsely marked unpatented articles," in violation of 35 U.S.C. §292; "intended to dispose of real or personal property within the meaning of the California False Advertising Law"; and that Nautilus's "conduct of mismarking the accused machines was done (1) in trade or commerce and (2) impacted the public interest within the meaning of the Washington Consumer Protection Act." A00186.

In July 2012, Plaintiffs deposed Greg Webb, a former Nautilus Vice President of Engineering and the person in charge of patent markings on the Strength Machines. Webb admitted that Nautilus *knew* at the time of marking that: (1) at least seven models of Strength Machines were not covered by any of the marked

-18-

patents; (2) at least eight patents on the patent labels were inapplicable to each and every Strength Machines manufactured between 1999 and 2009 and that there was "no valid reason" for listing these patents on the patent labels; and (3) a number of patents listed on the patent labels were inapplicable to most Strength Machines. A00191–203.

In May 2013, Sukumar moved for partial summary judgment that Nautilus had falsely marked all Strength Machines with the intent to deceive the public. Sukumar also moved for partial summary judgment that Nautilus violated the California False Advertising Law and Unfair Competition Law.

### F. The district court grants summary judgment to Nautilus, holding that Plaintiffs cannot show cognizable injury or causation under any cause of action.

Also in May 2013, Nautilus moved for summary judgment, claiming that Plaintiffs had not suffered a "competitive injury" "as a result" of its admitted false marking within the meaning of §292(b) or any cognizable injury under Plaintiffs' state-law claims.

Plaintiffs responded with a series of mutually corroborating sworn declarations and other evidence—described above in the Statement of Facts and below in sections I.A.2 and I.B of the Argument—setting forth specific facts establishing that he and his business had suffered cognizable injuries under all four causes of action and that those injuries were the result of Nautilus's false markings.

Despite that evidence, much of which was unrebutted, the district court granted summary judgment in favor of Nautilus, holding that Plaintiffs' evidence was insufficient to demonstrate that they suffered any "competitive injury" under §292 as a result of Nautilus's false marking. The court offered no independent analysis of Sukumar's state-law claims, stating simply that those claims failed for the same reasons as the false-marking claim.

The district court entered final judgment on December 6, 2013. This appeal followed.

## SUMMARY OF ARGUMENT

**I.A.** The district court erroneously concluded that Plaintiffs, as potential competitors, could not demonstrate "competitive injury." The text of the statute, the prior holdings of this Court, and the legislative history make clear that individuals deterred from direct competition by a false patent label and who have suffered concrete injury as a result (*e.g.*, work-around costs) may seek redress under §292. Plaintiffs offered extensive, unrebutted evidence documenting unnecessary expenses sunk into investigating, evaluating, and working around Nautilus's willfully falsified patent claims.

**I.B–C.** The district court resolved factual disputes not properly addressed at the summary judgment stage. It concluded that any injury suffered by Plaintiffs was not "competitive" because the evidence did not show an intent or ability to

compete prior to the initiation of the suit. It did so by making judgments on the credibility of Plaintiffs' testimony, ignoring corroborating evidence from third-party witnesses, categorically disregarding probative evidence of subsequent actions, blatantly reading testimony out of context, and generally viewing the evidence in a light most *unfavorable* to the Plaintiffs. At very least, the record manifests a triable issue of fact on whether Plaintiffs intended to and where capable of competition in the fitness-machine market.

**I.D.** Further, the court held Plaintiffs to an unduly restrictive "sole causation" standard. This theory of causation is devoid of any basis in the text of §292, the broader framework of IP law, or common sense. Under any fair standard of causation, Plaintiffs have submitted ample evidence that its competitive injuries flowed from Nautilus's false markings. The court's holding to the contrary not only misconstrued the law, but also resolved triable factual disputes against the Plaintiffs.

**II.** Reversal is also warranted on Plaintiffs' state-law claims. Despite the fact that Plaintiffs' California and Washington state claims have distinct and far more liberal standards of proof, the court resolved these claims merely by reference to its flawed §292 analysis. Neither set of claims requires a "competitive injury," much less "sole" causation. Under the correct legal standard, the record is replete with triable disputes of fact on both sets of claims.

**III.** On remand, this matter should be transferred back to the Central District of California. The California court entertained a transfer motion from Nautilus submitted five months into the litigation and supported by threadbare supposition that material fact witnesses resided in Virginia. As time told, those assertions were false. The vast majority of the witnesses identified in Nautilus's transfer papers were low-level line workers and sales person who knew nothing of Nautilus's patent-marking practices. As the former owner of the Independence, Virginia plant, Nautilus knew or should have known that. Absent any demonstrable link to Virginia, this case should be remanded to its place of origin—Central California.

## STANDARD OF REVIEW

Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any genuine fact dispute that "might affect the outcome of the suit under the governing law" is "material," and is sufficient to preclude summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When applying this standard "the judge cannot summarily try the facts; the judge's role is limited to applying the law to the facts that have been established by the litigants' papers." 10A Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 2725 (3d ed. West 2014). This Court reviews the grant of summary judgment without deference to the district court. *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1339 (Fed. Cir. 2010).

# ARGUMENT

## I. The Grant Of Summary Judgment On Plaintiffs' Federal False Marking Claim Must Be Reversed.

The district court recognized that the heart of the false-marking aspect of this case is Congress's 2011 amendment of §292. As the district court stated, the new "competitive injury" requirement "was intended to eliminate plaintiffs with no connection to the false marking," and to limit private false-marking actions "to a specific group: persons or entities who suffered a competitive injury from the false marking." A00013. "The question before the Court" therefore was, and remains, a simple one: "whether Plaintiffs here are included in that group." *Id.*

The district court concluded that they were not. That was error. Sukumar and SCSRA are hardly, as the district court would have it, "plaintiffs with no connection to the false marking." To the contrary, they submitted extensive evidence that established direct connections to, and injuries from, Nautilus's false marking: the false patent markings on Nautilus's machines deterred them from entering Nautilus's fitness machine market, and forced them to incur significant business and legal costs.

As is plain from the statutory text—and as this Court explained in *Forest Group* and *Clontech Labs., Inc. v. Invitrogen Corp.*, 406 F.3d 1347 (Fed. Cir. 2005)—these are precisely the kinds of injuries that §292 is intended to prevent. Congress's 2011 changes to §292 did not alter the *types of injuries* remedied by the statute—they merely *narrowed the class of plaintiffs* who may bring a false-

marking claim to those who *actually suffer* such injuries.  *Forest Group* and *Clontech* thus provide the applicable standard for "competitive injury."  And under that standard, Plaintiffs' evidence was more than sufficient to create a genuine dispute of material fact.  The case should be remanded for trial on the merits.

### A. Plaintiffs provided evidence of precisely the kind of "competitive injury" that the amended §292 exists to prevent.

Under the revised §292, the threshold question is whether the plaintiff has suffered a "competitive injury."  The statute does not define "competitive injury," and this Court has yet to address its meaning and scope.  But the plain text, this Court's false marking jurisprudence, and the legislative history all confirm that the injuries suffered by Plaintiffs—being improperly deterred from competing in Nautilus's market and incurring unnecessary expenses in their effort to avoid the falsely marked patents—are exactly the kinds of "competitive injury" that Congress enacted §292 to prevent.

### 1. The plain meaning of "competitive injury" is just that—injury to a plaintiff's ability to compete with the false marker.

Statutory construction must begin with the text: The "cardinal canon" of statutory interpretation is that "a legislature says in a statute what it means and means in a statute what it says there."  *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 576 F.3d 1348, 1367 (Fed. Cir. 2009) (citing *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).  The plain meaning of the phrase "competitive injury" is "a disadvantage in a plaintiff's ability to compete with a defendant,

caused by the defendant's unfair competition." *Black's Law Dictionary* 332 (9th ed. 2009). The few courts to address §292's "competitive injury" requirement have reached similar conclusions. For example, in *Fisher–Price, Inc. v. Kids II, Inc.*, No. 10–CV–00988A(F), 2011 WL 6409665, at *9 (W.D.N.Y. Dec. 21, 2011), the district court suggested that the plain meaning of "competitive injury" requires the plaintiff to show that false marking "prevented or frustrated" its "efforts to enter" the market. *Accord Greene v. Ab Coaster Holdings, Inc.*, 2012 WL 4442749, at *13 (S.D. Ohio Sept. 25, 2012); *McCabe v. Floyd Rose Guitars*, No. 10CV581 JLS (JMA), 2012 WL 1409627, at *7 (S.D. Cal. Apr. 23, 2012). As we explain below, this is precisely the kind of false marking injury identified by this Court prior to the amendment, and precisely the kind of injury Plaintiffs have offered evidence to prove. In *Forest Group*, this Court explained that §292's purpose is to prevent harm to "potential" competitors and competition—and Congress's 2011 amendments do not alter that purpose.

This Court's pre-amendment description of false-marking injury in *Forest Group* comports with the plain meaning of "competitive injury" as used in amended §292(b). In *Forest Group*, this Court described the harms that the prohibition on false marking was enacted to prevent. Those harms overwhelmingly relate to competition. As the Court explained, §292's *raison d'etre* is that "[a]cts of false marking deter innovation and stifle competition in the marketplace." 590 F.3d at

1302–03 (citing 7 Donald S. Chisum, *Chisum on Patents* § 20.03[7][c][vii] (2009)).

At its most effective, false marking can prevent competition from occurring at all. As the Court explained, "[i]f an article that is within the public domain is falsely marked, *potential* competitors may be dissuaded from *entering* the same market." *Id.* (emphasis added); s*ee also, e.g.,* *Frolow v. Wilson Sporting Goods Co.*, 710 F.3d 1303, 1309 (Fed. Cir. 2013) (noting that the amended §292 is intended "to remedy any harm" caused by false marking "to *would-be* competitors"). As a matter of common sense, if false marking that harms an existing competitor causes "competitive injury," then false marking that *deters competition entirely* must cause "competitive injury" too.[1] To conclude otherwise would be to relieve from liability the *most effective* false markers—those who eliminate competition altogether.

Preventing a potential competitor from entering the market is not, however, the only harm false marking may cause. As this Court explained in *Forest Group*, false marking may also "cause unnecessary investment in design around" solutions intended to avoid the marked patent." 590 F.3d at 1303. It may also force actual or potential competitors to incur unnecessary costs "to analyze the validity or en-

---

[1] Indeed, some district courts have suggested that *only* plaintiffs who have been entirely deterred from competing can state a claim for competitive injury. *See, e.g.*, *Ab Coaster Holdings,* 2012 WL 4442749, at *13.

forceability of a patent whose number has been marked upon a product with which [the] competitor would like to compete." *Id*. Where the markings are false, all these expenses are unnecessary, and represent a deadweight loss to the potential competitor that incurs them—burdening that potential competitor and unfairly benefiting the false marker.

Remarkably, the district court concluded that the injuries described in *Forest Group* are not "competitive injuries" at all, "but instead harms suffered by the general public." A00016. That conclusion is insupportable: *Forest Group*'s discussion of §292's purpose repeatedly emphasizes harms to competitors, "potential competitors," and competition. There is no reasonable question that, as analyzed there, §292's primary purpose is to prevent and remedy competitive injuries.

Nor is there any basis for concluding—as the district court evidently did—that Congress's 2011 amendments to §292 in any way undermined or changed the statute's focus on preventing competitive injuries. Rather, the 2011 amendments merely sought to reduce the potential for abuse of the statute's *qui tam* provision by restricting the private right of action to those who *actually suffered* competitive injuries. Nothing about the amendments suggests that Congress intended to limit the *scope* of competitive injuries of the kind described in *Forest Group*.

Congress was well aware of *Forest Group* when it amended §292 in 2011—indeed, the legislative history suggests that Congress added the "competitive inju-

ry" requirement *in response* to *Forest Group*'s holding that in *qui tam* proceedings, the $500 fine payable for violations was to be assessed for each falsely marked product. As the House Report on the 2011 amendments explains, this aspect of *Forest Group* greatly increased the potential awards available to *qui tam* plaintiffs, thus "creat[ing] a surge in false-marking *qui tam* litigation." H.R. 112-98 Part 1, at 53. Congress made several statutory changes to correct these perceived abuses of the *qui tam* provision, restricting the private right of action to address only the baseline false-marking suit: one "targeted at parties that assert fictitious patents in order to *deter competitors*" from entering the marketplace. *Id.* To that end, Congress "replace[d] the qui tam remedy for false marking with a new action" limited to "party that has suffered a competitive injury," with the intention to "eliminate litigation brought by unrelated, private third parties." *Id.*

As Senator Kyl explained in related remarks, the proliferation of *qui tam* lawsuits brought by "patent lawyers" claiming "the right to enforce a fine of $500 for every marked product" represented "a tax that patent lawyers are imposing on domestic manufacturing—a shift in wealth to lawyers that comes at the expense of manufacturing jobs." 157 Cong. Rec. S5319-03 (2011) (remarks of Sen. Kyl). The amendment "prevents such abuses" by "repealing the statute's qui tam provisions while still allowing parties who have separate *actual injury* from false marking to sue." *Id.*; *see also* H.R. Rep. No. 112-98, pt. 1, at 53 (2011) ("The United

States would be allowed to seek the $500-per-article fine, and competitors may re-cover in relation to *actual injuries that they have suffered as a result of false mark-ing….*").  Thus, the purpose of the "competitive injury" requirement is to set pa-rameters on the class of plaintiffs authorized to seek redress under the statute.

In short, the legislative history confirms that the purpose of the "competitive injury" requirement is not to alter the kinds of false-marking injury identified in *Forest Group*, *see* H.R. Rep. No. 112-98, pt. 1, at 80 ("A person who has suffered a competitive injury as a result of a violation may *still* bring a civil action in US district court for compensatory damages."), but to limit the private right of action to those w*ho actually suffer* those kinds of injury.  And as we explain below, the competitive injuries described in *Forest Group* are precisely the kinds of injuries that Plaintiffs' evidence proves here.

### 2. Plaintiffs offered extensive evidence of precisely the kinds of compet-itive injury described in *Forest Group*.

Below, Plaintiffs offered evidence demonstrating that Nautilus's false mark-ing caused them to suffer precisely kinds of competitive injury identified in *Forest Group*: first, the false marking *deterred them from competing* with Nautilus in the exercise machine market; and second, it *forced them to incur unnecessary expenses* investigating, evaluating, and seeking to circumvent the falsely marked patents.

To demonstrate that Nautilus's false marking deterred Plaintiffs from com-peting in the exercise machine business, Plaintiffs submitted two mutually corrobo-

rating, sworn declarations and deposition testimony. In his declaration, Sukumar stated that "[t]he false and misleading patent markings on Nautilus machines intimidated and deterred SCSRA and me from entering the fitness-equipment market" by "impeding our efforts to design, prototype, manufacture, and sell fitness equipment using the core designs of Nautilus['s] 2ST and Next Generation" lines of machines. A00362. Sukumar further confirmed that, "[i]f not for Nautilus's false marking, SCSRA and I would have directly competed with Nautilus in the sale of fitness equipment." *Id*. He also testified directly to this injury in his deposition, explaining how Nautilus's false claims of patent protection "thwarted" his business plans. A00370–73; *see also* A00315–16, 00334, 00338–39.

Sukumar's account is directly corroborated by Frank Smith, Sukumar's former sales representative at Nautilus. Smith confirms that "Mr. Sukumar explained to me on several occasions that he had not designed, built, and began [sic] to sell his own machines because he was afraid that he and his company, SCSRA, would be held liable for infringing [the] many patents listed on Nautilus machines." A00482. In fact, Smith confirms that he personally, while still a Nautilus employee, showed Sukumar the labels with the (falsely) marked patents, and that he later "encouraged Mr. Sukumar not to design or manufacture machines because I believed he would be infringing Nautilus's patents." *Id*.

Plaintiffs also offered extensive evidence that Nautilus's false markings caused them to incur unnecessary legal and business expenses. For example,

Plaintiffs documented between $59,756 and $108,271 in fees paid to the law firm of Dickstein Shapiro for work "related to determining the validity and enforceability of Nautilus' patents, and other patent related issues." A00415–16, 00418. Plaintiffs also submitted evidence of additional expenses they incurred in attempting to avoid, circumvent, or acquire Nautilus's marked patents—expenses they would not have incurred but for the false marking. Those expenses included nearly $35,000 in legal fees paid to the law firm of Jones Day—$6,680 in attempts to license Nautilus's patents, $25,568 in attempts to purchase Nautilus's assets, and another $2,150 in an effort to acquire MedX, in the hope of using modified MedX machines in lieu of the (allegedly) patented Nautilus machines. *Id.*

In addition, Plaintiffs' evidence showed that their effort to determine whether MedX machines offered a viable substitute for the Nautilus machines led them to purchase $132,000 of MedX equipment. A00370–71, 00416, 00418. Similarly, Plaintiffs' effort to avoid Nautilus's falsely marked patents led them to acquire and evaluate substantial numbers of other potential substitute machines from different manufacturers, including Keiser Corp., Paramount Fitness Corp., Precor, Tetrix, Technogym, and Hoist Fitness Systems. A00371–72, 00482. The acquisition and storage of those machines resulted in costs to Plaintiffs in excess of $1.8 million, of which Plaintiffs' expert witness attributed "at least $242,010" to Nautilus's false marking. A00416–17.

What did Nautilus offer in response to all this evidence of competitive injury? Nothing. There are no declarations or other evidence contradicting Sukumar and Smith's sworn statements that Nautilus's false markings deterred Plaintiffs from entering the fitness machine market, or challenging Plaintiffs' evidence of the expenses they incurred in attempting to avoid Nautilus's falsely marked patents. And even if Nautilus had offered such evidence, that would simply create a factual dispute about the nature and extent of Plaintiffs' injuries—precluding summary judgment.

## B. Plaintiffs provided ample evidence of their intent and capability to compete with Nautilus.

The district court's alternative basis for decision on the "competitive injury" requirement is no more convincing. According to the court, Plaintiffs' injuries were not *competitive* injuries because Plaintiffs failed to show both that they *intended* to compete with Nautilus and that they "w[ere] capable or able to compete (or actively trying to do so)." A00019. That was error. As the Supreme Court has explained, "questions of subjective intent … rarely can be decided by summary judgment." *Harlow,* 457 U.S. at 816. That principle holds here, where Plaintiffs introduced multiple declarations, deposition testimony concerning their intent. Moreover, Plaintiffs' documentary evidence demonstrates both their intention and their ability to compete. Nautilus offered no contrary evidence at all.

*1. Sukumar's declaration and deposition.* Sukumar's declaration describes two separate conversations with former Nautilus employee Frank Smith in

-32-

2001–2002 in which Sukumar "specifically explained [his] plan to *design, manufacture, deploy, and sell machines of [his] own design* using … core features of Nautilus' designs" in two specific lines of Nautilus machines—the "Nautilus 2ST and NG machines." A00366 (emphasis added). Sukumar repeatedly confirmed these statements in deposition. For example, when asked whether he "intend[ed] to … modify [Nautilus machines] and resell them," Sukumar unequivocally responded "yes," A00323, adding that his own machines would "incorporate the advancements" that he had designed for use in his "market niche"[2] of exercise machines for use by seniors in rehabilitation. A00335 ("I needed Nautilus's equipment back then and even do now. … I can certainly go ahead with the understanding that they're not covered by any patents, therefore I can do what I wish in terms of upgrading and actually incorporating[,] and I've got … plans in place.").

　　*2.　　Smith's corroborating declaration.* Smith's declaration directly corroborates Sukumar's account. As he confirms, in 2001–2002 Sukumar expressed to him Sukumar's plan "to *design, manufacture, and sell machines of his own design*" in competition with Nautilus. A00481. Smith also confirms Sukumar's ex-

---

[2] Contrary to Nautilus's assertions below, it is irrelevant that Plaintiffs' short-term plans do not include competing in the market at the same scale as Nautilus. *See* A00020 n.13. The text of §292 contains no such requirement, and for good reason. Nautilus's theory would lead to the nonsensical conclusion that established market participants have free rein to terrorize upstart companies with bogus claims of patent infringement, but face legal action for making similar threats to a competitor of equal stature.

pectation that "his machines would implement his own designs on top of core features" found "in the Nautilus 2ST and NG machines," and that during one of their discussions, they examined the Nautilus equipment's patent markings and discussed the obstacle they posed to Sukumar's plans. *Id.* Finally, Smith confirms Sukumar's belief "that he had the resources" to launch his own exercise-machine business. *Id.*

3. *Plaintiffs' acquisition of equipment for potential use in the exercise-machine manufacturing business.* In attempting to identify suitable machines for modification into Plaintiffs' own line of exercise equipment, Plaintiffs acquired, tested, stored, and in some cases modified more than 200 different exercise machines from various manufacturers—at a cost of nearly $1 million. A00416–17, 00419. And beginning in 2006, Plaintiffs began subcontracting with other equipment manufacturers to produce prototypes incorporating Plaintiffs' designs. Those subcontracts have resulted in the production of several prototype machines. A00374, 00395–98.

4. *Plaintiffs' efforts to acquire Nautilus's and others' intellectual property to further their business plans.* In July 2004, Sukumar communicated to Nautilus his interest "in acquiring a license to use their patents covering their 2ST and NG lines of equipment"—the same equipment lines that both Sukumar and Smith

identify as the likely base for Sukumar's competitive machines.[3]  A00369.  The desire for such a license is consistent with Plaintiffs' interest in launching their own exercise/rehabilitation machine business.

Similarly, the evidence showed that in 2009, Plaintiffs directed their attorneys to explore the possibility of purchasing Nautilus's assets outright, to provide them with "a path to Nautilus's patents."  A00370.  That same year, Plaintiffs investigated machines made by another company, MedX, as possible bases for their own, modified machines. Plaintiffs explored the possibility of purchasing MedX out of bankruptcy "to enter the business of manufacturing and selling fitness equipment," incurring more than $130,000 in expenses in that unsuccessful effort. A00370–71.

5.  *Plaintiffs' post-lawsuit effort to launch a competitive exercise machine business.*  In 2012, upon learning that the district court had found Nautilus's patent markings to be false, Plaintiffs began investing additional time, money, and resources into the development of a competing line of exercise machines.  They retained the services of John Whitman, a Wharton School professor specializing in

---

[3]  This license offer was not the same as Sukumar's 2009 general offer to settle all the parties' disputes, in which he asked for a license to use Nautilus's intellectual property "exclusively" in his own centers.  A00380–81.  That 2009 offer was the only one of Sukumar's many attempts to work around Nautilus's patents that expressly or impliedly restricted his planned use to his own centers.  In this particular attempt, Sukumar did not ask for a license to manufacture and sell under Nautilus' patents because he sincerely believed that, as before, Nautilus would rebuff his efforts if he pursued a general license to practice their patents.  A00369.

aging and long-term care, to obtain "updated research on the senior fitness market" and "develop a comprehensive business plan that includes" both "designing, manu-facturing, and selling" Plaintiffs' "own line of fitness equipment" and "providing fitness services to the senior population." A00373–74, 00422. They have worked with equipment designers and manufacturers to develop prototypes of their own line of fitness machines, including the machine shown below:






A00395–98.

Plaintiffs have also retained other industry professionals "to develop protocols and fitness equipment for the senior population, including working to embed strain gauges" in their machines "to accurately measure the improvements in strength and range of motion of users." A00374. And they are in negotiations to build an 86,000 square foot facility for "manufacturing fitness equipment." *Id.*; *see also* A00506.Viewed in the light most favorable to Plaintiffs, this evidence confirms that as early as 2001–02, Plaintiffs actively intended to enter the exercise/rehabilitation machine market to compete with Nautilus, and had the means to do so. At a minimum, the evidence is sufficient to create a genuine factual dispute precluding summary judgment.

## C. In finding no triable issue of fact, the district court misinterpreted testimony, failed to consider corroborating evidence, and ignored the probative value of Plaintiffs' post-lawsuit actions.

The district court, however, reached the exact opposite conclusion, holding that Plaintiffs failed to create a genuine fact issue on the question of competition. A00023. In doing so, it committed three principal errors. First, the court blatantly misread Sukumar's testimony regarding his prior intentions. Second, it ignored Smith's testimony and extensive other evidence corroborating the same. Finally, the court refused to consider Plaintiffs' post-lawsuit efforts to launch their busi-

ness, following the determination that Nautilus had in fact falsely marked its machines.

### 1. The district court's assertion that Sukumar "admitted" a lack of intent to compete with Nautilus grossly distorts his testimony, which repeatedly expresses such intent.

The court dismissed Sukumar's sworn, detailed account of his early intention to compete with Nautilus, asserting that it conflicted with deposition testimony in which Sukumar purportedly "admitted" that he had not formed the intention to compete with Nautilus until 2012. A00022. But Sukumar admitted no such thing. To the contrary, Sukumar's deposition testimony on its face *confirms* that his intention to compete with Nautilus predates the suit.

Specifically, Nautilus asked Sukumar about a 2009 letter in which Sukumar's counsel, in connection with an attempt to achieve a settlement of other litigation, sought a license to Nautilus's patents for the specific purpose of making exercise machines for use "exclusively in Sukumar-owned rehabilitation centers." A00381. Nautilus's counsel then asked Sukumar when his intent "changed" from using his machines in his own centers "to making machines for resale?"—and Sukumar answered that "making machines for resale" had been part of his plan all along:

> Q. All right. Thank you. When did your intent change from that to making machines for resale?
>
> A. Well, *making machines for resale was also part of that other prior intent*, but very recently after Judge Turk's order -- I think it's eight weeks ago or so -- that's when I decided that since Nautilus machines are no longer covered by patents then I can make my own machines and further my business prospects that way.

A00324 (emphasis added).

The district court seized upon this exchange to find *as fact* that "neither at the time they filed their lawsuit, nor when they first amended to state a 'competitive injury,' did Plaintiffs intend to compete" in "the sale of exercise equipment." A00022–23.  But that is not a fair reading of Sukumar's testimony—and certainly not the *only* fair reading, as would be required to support summary judgment.  On its face, Sukumar's response suggests that his intent had not "changed" at all—that "making machines for resale" had *always* been part of his "prior intent."

The excerpt seized on by the district court merely confirms that only after Nautilus's machines were judicially declared to be falsely marked did Sukumar believe that he *could* lawfully "make my own machines and further my business prospects that way."  A00324.   Drawing all reasonable inferences in favor of Sukumar, the district court could not properly have concluded that his deposition testimony "established" as fact that Sukumar's intent to compete with Nautilus arose only after this litigation began.  Indeed, reading his testimony in context, it establishes the contrary.

**2. The district court improperly disregarded Smith's corroborating declaration and extensive other evidence of Plaintiffs' efforts to enter the market.**

The district court also dismissed Sukumar's declaration statements as self-serving "protestations"—mere "conclusory testimony" that was "not enough to defeat summary judgment" in light of what the court regarded to be contradictory testimony in Sukumar's deposition. A00019, 22. But Sukumar's declaration was anything but "conclusory." To the contrary, it was highly detailed, identifying approximate dates, the presence of a Nautilus employee (Smith), and the contents of their discussions. A00365. And the details set forth in Sukumar's declaration are *specifically corroborated* by Smith. The district court offered no basis for ignoring Smith's corroborating statements, except the assertion that Sukumar's deposition "admission" was sufficient to trump Smith's declaration. The district court cited no authority for that assertion (and we are aware of none), but in any event we have already established that no such "admission" ever occurred.

Sukumar's and Smith's mutually corroborating statements are further bolstered by extensive evidence of Plaintiffs' efforts to enter the marketplace from 2002-2009—evidence that the district court simply ignored. It ignored evidence of the massive expenses incurred to acquire hundreds of exercise machines for research and modification. A00372, 00419. It ignored evidence of subcontracts with manufacturers that produced prototype machines. A00483, 00496. It ignored evi-

dence of Sukumar's 2009 inquiries into purchasing Nautilus's assets outright. A00370.  And it ignored evidence of Sukumar's 2009 inquiries into purchasing MedX out of bankruptcy.  A00370–71.

As for Plaintiffs' multiple efforts to license Nautilus's patents, the district court addressed only one—the 2009 licensing proposal that would have permitted Sukumar to use Nautilus's intellectual property "exclusively" in his centers. A00022–23.  Sukumar's declaration explains that he did not ask for a license to manufacture and sell under Nautilus' patents in that particular instance because he sincerely believed that, like before, Nautilus would rebuff his efforts   A00369. The district court ignored that explanation.  More important, it also wholly ignored Sukumar's 2004 proposal to license Nautilus's patents "covering their 2ST and NG lines of equipment"—the same equipment lines that both Sukumar and Smith identi-fied as the likely base for Sukumar's competing machines.  *Id.*  In deciding sum-mary judgment, the district court was not at liberty to credit the single piece of evi-dence arguably supporting Nautilus's position (the solitary 2009 license proposal limited to use in Sukumar's rehabilitation centers) while ignoring all the evidence supporting Sukumar's.

Finally, the district court suggested that Plaintiffs' primary claim of competi-tive injury—their inability to enter the competitive marketplace for fear of patent infringement liability—was merely a "subjective fear" of injury, and so insufficient

to establish competitive injury. A00020. This conclusion is flawed in multiple respects.

As a threshold matter, the district court's "subjective fear" analysis is built upon the faulty premise that this Court's declaratory judgment jurisprudence provides the proper framework for assessing Plaintiffs' right to sue. *See* A00020 (citing *Prasco, LLC v. Medicis Pharms. Corp.*, 537 F.3d 1329, 1338–39 (Fed. Cir. 2008)). Not so. Nothing in the text or legislative history §292 suggests that Congress intended to peg plaintiffs' ability to sue for false marking to this Court's standing analysis for a declaratory judgment non-infringement action. And in any event, the court's analysis is wrong: Plaintiffs' fear of infringement liability was not merely "subjective." To the contrary, it was objectively reasonable. Not only was the Nautilus equipment (falsely) marked to indicate patent protection—a practice the very purpose of which, as this Court has explained, is to "dissuade" potential competitors "from entering the same market*," Forest Group*, 590 F.3d at 1303—but Plaintiffs were repeatedly warned by Nautilus personnel that "Nautilus vigorously protected" its intellectual property, and that copying or modifying Nautilus machines would result in infringement of the listed patents. *Id.* at 00364–65; *id.* at 481; *see also* A00314 (acknowledging that "upwards of 30 patents" covered each Nautilus machine, making it "not possible" to proceed without "circumventing Nautilus's patents"). The combination of the false markings and Nautilus's

-42-

explicit warnings are sufficient to establish the "*reality* of the threat of … injury that is relevant" to determining injury-in-fact. *Prasco LLC*, 537 F.3d at 1338; *see also Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998).The district court improperly disregarded Sukumar's evidence of his post-lawsuit efforts to compete.

Following the court's declaration that Nautilus had falsely marked its machines, Plaintiffs took concrete steps to establish their business. *See* Sec. I.B.5, *supra*. As Sukumar himself put it, the order exposed Nautilus's "hoax" and cleared "a roadblock to [his] activities." A00299. According to the district court, however, this evidence of post-lawsuit activity "is not proof a jury can rely on" as proof of Plaintiffs' pre-lawsuit intentions. *See* A00021.

That was error. It is well established that, "[s]ubsequent conduct may be highly probative of prior intent." *United States v. Whaley*, 786 F.2d 1229, 1232 (4th Cir. 1986). The same logically follows for capability. Plaintiffs' efforts, undertaken immediately upon learning that Nautilus's patent markings were false, are probative of what Plaintiffs' could have and would have done *ab initio* without the looming specter of patent-infringement liability *See id.*; *see also Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 524 (3d Cir. 2003) (affirming consideration of "[s]ubsequent actions by an employer" as probative of the his non-discriminatory intent when he terminated the plaintiff).

When viewed in the light most favorable to Plaintiffs, the non-movants, the record contains abundant evidence supporting the claim that they had both the intention and the means to launch a competitive exercise machine business long before this lawsuit. The district court's ruling to the contrary is reversible error.

## D. The district court held Sukumar to an improperly restrictive "exclusive causation" standard, and improperly resolved a fact dispute as to the cause of Plaintiffs' injuries.

The district court found as fact that Nautilus's false patent markings were not the cause of Sukumar's inability to enter the competitive marketplace, concluding that it "defies common sense to conclude that, for more than ten years, Plaintiffs have not entered the market to compete with Nautilus and that the *sole* item holding them back was their fear of infringing patents that were falsely listed on the accused machines' patent labels." A00020 (emphasis added).

That conclusion was erroneous for at least two reasons. First, the district court imposed an improperly strict standard for causation: there is no requirement that false marking be the "sole" or exclusive cause of the claimed injury. And second, under any possible causation standard, there was substantial evidence supporting Sukumar's assertion that Nautilus's anticompetitive marking practices were the cause of his inability to compete in the exercise machine market.

**1. The district court improperly required Sukumar to show that Nautilus's false marking was the "sole" cause of his competitive injury.**

The district court expressly faulted Sukumar for failing to show that Nautilus's false marking was the "sole" factor preventing him from competing. A00020. Consistent with that standard, it rejected Sukumar's causation evidence in part because Plaintiffs had purportedly blamed their competitive injury on factors other than false marking. A00021. Because false marking was (allegedly) not the *exclusive* cause of Plaintiffs' harm, they could not establish that false marking caused their competitive injury. *Id.*

The district court's "sole" or exclusive causation requirement is unsupportable. The statutory text imposes no such requirement. The plaintiff need only show that his injury occurred "as a result of" the defendant's false marking. 35 U.S.C. §292 (b). The ordinary, natural meaning of "result" encompasses occurrences linked by a chain of cause and effect. *See, e.g.*, *Webster's Third New International Dictionary* 1937 (2002) (defining "result" as "something that results as a consequence, effect, issue, or conclusion"). Nothing about the word suggests a requirement of causal *exclusivity*. Nor does the legislative history offer any basis for understanding "as a result of" so restrictively. By limiting §292(b) to those injuries with only a single cause, the district rewrote the statute.

The broader statutory framework of intellectual property and unfair competition further demonstrates that the "exclusive causation" standard chosen by the dis-

trict court is incorrect. In principle, §292(b) is very similar to § 43(a) of the Lanham Act: both forbid misrepresentations of IP rights aimed at gaining an unfair advantage over competitors. *Compare* 35 U.S.C. §292 (b) (providing recovery for those suffering "competitive injury"), *with* 15 U.S.C. § 1127 ("The intent of this chapter is … to protect persons engaged in such commerce against unfair competition[.]"). Under the Lanham Act, Plaintiffs need only allege proximate causation to sustain a complaint, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1393 (2014), and at most need only show 'substantial factor' causation of injury to sustain a jury verdict, *Seven-Up Co. v. Coca Cola Co.*, 86 F.3d 1379, 1387 (5th Cir. 1996). Plaintiffs need not at any point "prove that the defendant's conduct was the only or even the predominant cause of this [false-advertising] injury." *Id.* at 1387 n.12. Holding false-marking plaintiffs to this higher standard unmoors §292 from the common ground it shares with the Lanham Act.

The district court's exclusive-causation requirement is also inconsistent with other statutory regimes directed at protecting the public from fraud—none of which has been construed to require exclusive causation. For example, the private right of action for violations of the Commodities Exchange Act, 7 U.S.C. § 25(a)(1)—which permits recovery of losses "resulting from" violations of the act—has been construed to require only "substantial factor" causation. *S&A Farms v. Farms.com, Inc.*, 862 F. Supp. 2d 898, 914–15 (S.D. Iowa 2011). Simi-

larly, private plaintiffs seeking to recover for securities fraud need only show that the fraud was the "proximate cause" of their investment losses, in the sense that "the risk that caused the loss was within the zone of risk concealed by the misrepresentations." *In re Omnicon Group Securities Litigation*, 597 F.3d 501 (2d Cir. 2010).

The district court's imposition of a sole-causation standard is also contrary to common sense. False marking is only one means by which a would-be monopolist can reduce or foreclose others' opportunities to compete in the market; there are many others, as the antitrust laws attest. Under the district court's exclusive causation standard, a false marker could avoid liability under §292 simply by engaging in *additional* anticompetitive acts that cause harm to the would-be competitor. That illogical result would defeat the purpose of the statute.

### 2. Plaintiffs submitted extensive evidence to support their contention that Nautilus's false marking caused their competitive injuries.

The district court's exclusive-causation standard was unduly strict. Under any applicable causation standard—whether it requires "but-for," "proximate," or "substantial factor" causation—Sukumar provided evidence of injury causation that was sufficient to preclude summary judgment.

In his sworn declaration, Sukumar states unequivocally that Nautilus's false markings were the cause of his decision not to enter the market, explaining that

> I believed that *Nautilus[*'s]* *patents precluded SCRSA and me from*
> *manufacturing and selling customized fitness equipment* based on
> Nautilus'[s] core design elements (e.g., as found in its 2ST and NG
> lines of machines. *If not for these false markings*, SCSRA and I
> would have taken Nautilus's core design elements and improved upon
> them to manufacture machines with greater functionality, precision
> and safety directed at the senior fitness market, and *we would have*
> *sold them in direct competition with Nautilus*.

A00362*; see also* A00366, 00368. Sukumar confirmed this in his deposition, ex-

plaining that his intent to launch his exercise-machine business was frustrated by a

"hoax" perpetrated by Nautilus and that he intends now to "go forward" because

Nautilus's alleged patents "no longer … hold a roadblock to my activities[.]"

A00299.

Smith's declaration directly corroborates Sukumar's, confirming that "Mr.

Sukumar explained to me on several occasions that he had not designed, built and

began [sic] to sell his own machines because he was afraid that he and his compa-

ny, SCSRA, would be held liable for infringing many patents listed on Nautilus

machines." A00480–72.

Other evidence also supports Sukumar's and Smith's account. For example,

Sukumar has explained that he undertook efforts in 2004 and 2009 to license or

otherwise acquire Nautilus's intellectual property because he believed that unless

he obtained a license, Nautilus's patents prevented him from producing modified

Nautilus machines and selling them in the marketplace. A00312–13.

Finally, there is the evidence of Sukumar's actions following the adjudication of Nautilus's markings as false, in 2012. Soon thereafter, Sukumar launched a multi-pronged effort to launch his own exercise machine business. As described in detail above at Part I.B.5, Plaintiffs retained experienced consultants in long-term care and rehabilitation, began negotiating a lease for a manufacturing facility, and produced prototypes of new machines. A00367, 00373–74, 00422, 00496–97, 00500. The actions Plaintiffs took to launch their competitive business upon learning that Nautilus's machines were falsely marked are strong evidence of the actions Plaintiff would have taken if those machines had never been marked at all— and thus that the false marking caused Plaintiffs to be deterred from entering the market.

Viewed in the light most favorable to Sukumar, that evidence tends to show injury causation—that but for Nautilus's false markings, Sukumar would have, and could have, launched his competitive business long ago. This evidence was sufficient, at a minimum, to create a genuine dispute of material fact regarding the cause of Sukumar's decision not to enter into competition with Nautilus.

### 3. The district court improperly resolved genuine disputes of fact as to whether Nautilus's false marking caused Sukumar's competitive injury.

The district court chose to resolve the causation dispute in Nautilus's favor, for two reasons. First, it relied on its erroneous exclusive-causation standard, find-

ing no causation because (it asserted) Plaintiffs had previously blamed their injuries on other factors. Second, it gave no weight to the evidence of Plaintiffs' post-2012 activities. Both those reasons are wrong.

In rejecting Plaintiffs' evidence of causation, the district court asserted that "Sukumar has repeatedly blamed other actions of Nautilus—not false patent labels—for the years of delay in accomplishing his business objectives." A00021. But as we have explained, the false-marking statute does not require a plaintiff to show that his injury had no causes other than false marking. And just as important, the factual premise of the district court's analysis is wrong: There is *no evidence at all* that Plaintiffs have ever blamed the frustration of the particular business objective at issue here—the manufacturing and sale of competing exercise machines—on anything but Nautilus's false marking.

The evidence cited by the district court is not to the contrary. The deposition excerpts cited in the opinion, *see* A00021, all relate to *other aspects* of Sukumar's business plans—primarily, his plan to operate stroke rehabilitation centers. By the district court's own account, Sukumar blamed "Nautilus's non-delivery of equipment" *not* for preventing his entry into the business of manufacturing and selling his own machines, but for a variety of unrelated injuries, including:

- preventing him from "comparing the projected costs or expenses of stroke rehabilitation centers versus spa facilities";

- "delaying his father's recovery"; and

- his inability to "go forward with his stroke rehabilitation center plans." A00021.

None of these statements relates at all to Plaintiffs' plan to launch their own fitness-machine business. The plans referenced here—to develop stroke rehabilitation centers— are not mutually exclusive with Plaintiffs' separate plan (extensively testified to in the Sukumar and Smith declarations) to design and manufacture his own unique line of machines in order to compete with Nautilus. The record contains no statement in which Sukumar even arguably blames his inability to launch a competitive exercise machine manufacturing business on anything but Nautilus's false marking. The district court's conclusion to the contrary was error.

The district court also disregarded the evidence of Plaintiffs' substantial efforts to enter the marketplace after Nautilus's patent markings were adjudicated to be false, stating that "concerted efforts after a lawsuit is filed … is [sic] not proof a jury can rely on to determine that the reason those efforts were not taken sooner was because of false patent labels." A00021.

This is sheer *ipse dixit*. Neither the district court nor Nautilus cited any authority for this proposition, and we are aware of none. It may be true that evidence of Plaintiffs' post-judgment-of-false-marking efforts to enter the marketplace cannot dispositively *prove* that Nautilus's false marking caused Plaintiffs' inability to

compete for purposes of summary judgment—but at a minimum those efforts *support* that conclusion. If a plaintiff asserts that an unauthorized "no trespassing" sign is unlawfully deterring him from accessing a public park, and upon removal of the sign immediately enters the park, what better evidence of causation could he provide? The extent to which Plaintiffs' post-2012 efforts support Plaintiffs' claims, and the weight they should be afforded, are precisely the kind of fact questions properly resolved by a jury. *Reeves*, 530 U.S. at 150 ("[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.").

## II. Regardless of whether Plaintiffs Prevail On Their False-Marking Claims, The Summary Judgment Of Nonliability On Plaintiffs' State-Law Claims Must Be Reversed.

The district court offered only cursory treatment of Sukumar's California and Washington state-law claims, simply rejecting without analysis Sukumar's claim to have "lost money as a result of Nautilus's false marking," for "the reasons previously set forth" in its rejection of Sukumar's §292 "competitive injury" claim. A00028 (rejecting California state law claims without analysis); *see also* A00029 (rejecting Washington state law claims without analysis). But the injury requirements of Sukumar's state-law claims are significantly less onerous than those of §292, and none requires proof of "competitive injury," however defined. Nor do any of Sukumar's state causes of action require proof that the defendant's unlawful

conduct was the exclusive cause of his injuries. Under the standards that actually apply to Sukumar's California and Washington law claims, Sukumar put forth sufficient evidence of injury and causation to survive summary judgment.

### A. Sukumar's evidence of harm to his "business or property" is sufficient to create a genuine fact dispute about his injury under state law.

None of Sukumar's state-law causes of action requires him to prove "competitive injury." To the contrary, all three have substantially less stringent injury requirements. California's UCL and FAL require only proof that a plaintiff "suffered injury in fact" and "lost money or property" as a result of the defendant's conduct. *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 884 (Cal. 2011). As the California Supreme Court has explained, the threshold requirement of "injury in fact" collapses into the requirement of "loss of money or property"; as a practical matter, a UCL/FAL plaintiff need only allege and prove a "loss of money or property" resulting from the defendant's actions. *Id*. at 887. The same is true under Washington law, which provides that cognizable "injury" includes any and all harms to a person's "business or property," Wash. Rev. Code §19.86.090, even if minor or non-quantifiable. *Mason v. Mortg. Am. Inc*., 792 P.2d 142, 148 (Wash. 1990).

Applying those expansive injury standards, Sukumar offered more than enough evidence to raise a genuine dispute of material fact as to whether he suf-

fered injury to his business or property for purposes of California and Washington law.  For example:

- Deterred by Nautilus's false markings, Sukumar refrained from entering the market for exercise machines, effectively depriving him of an attractive business opportunity for more than ten years, A00414.;

- Sukumar  incurred legal expenses that would have never been expended but for the falsely marked patents to analyze the validity and enforceability of the patents that were falsely marked on Nautilus's machines, A00374–75;

- Sukumar incurred unnecessary legal and other expenses in attempting to work around Nautilus's false marked patents, including expenses incurred in exploring the purchase of Nautilus's patent assets and MedX's business, A00370, 00375;

- Sukumar incurred unnecessary legal expenses in attempting to secure a license to the patents that were falsely marked on the Nautilus machines he wished to modify.  A00369–70, 00374–75.

These expenses satisfy the minimal showing necessary for a "loss of money or property" under California's UCL and FAL, *see Kwikset Corp.*, 246 P.3d at 887 (explaining that "unfair business practice allegedly [resulting] in repossession of [plaintiff's] vehicle (a loss of property) and a monetary payment in response to an

unlawful debt collection demand (a loss of money)" suffice), and harm to "business or property' under Washington's law. *See Nordstrom, Inc. v. Tampourlos*, 733 P.2d 208, 211 (Wash. 1987) (holding that injury to "reputation and goodwill" can sustain a CPA action).

The district court made no attempt to explain why it believed that Plaintiffs' did not constitute sufficient injuries under state law, choosing instead to refer back to its analysis of Plaintiffs' claimed "competitive injury" under the false marking statute. But whether an injury is a "competitive injury" for purposes of 35 U.S.C. §292 is not dispositive of, or even relevant to, whether an injury is a "loss of money or property" for purposes of the much more expansive state laws here at issue. At a minimum, Sukumar's evidence is sufficient to create a genuine dispute of fact on the question of cognizable injury.

## B. Sukumar's evidence is sufficient to create a genuine dispute of fact about injury causation under state law.

The district court's error in its determination of injury was repeated in its determination of causation, in which it applied the same "sole causation" standard to Plaintiffs' state-law claims that it used to reject his false marking claim. We have already explained that the sole causation standard is improper under the false marking statute. It is even more clearly improper under Sukumar's state-law claims, which have all been held specifically ***not*** to require exclusive causation.

### 1. The district court's "sole causation" standard has been expressly rejected by the California and Washington Supreme Courts.

As amended in 2004 by Proposition 64, the FAL and UCL provide a cause of action to all persons who have suffered an "injury in fact and [have] lost money or property *as a result of*" a violation. The Supreme Court of California has explained that "[t]he phrase 'as a result of' in its plain and ordinary sense means 'caused by' and requires a showing of a causal connection or reliance on the alleged misrepresentation." *Kwikset Corp.*, 246 P.3d at 888. To make that showing, "[i]t is ***not*** necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct." *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009) (internal quotation marks and alterations omitted) (emphasis added); *accord Kwikset Corp.*, 246 P.3d at 888. Rather, under the correct, "immediate cause" standard, "It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision." *In re Tobacco II Cases*, 207 P.3d at 39.

The Supreme Court of Washington has also unequivocally spoken on the issue of causation under the state's CPA, holding that "[a] plaintiff must establish that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury." *Indoor Billboard/Washington, Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 22 (Wash. 2007). This requirement of "but for" causa-

tion is satisfied by a "cause which in direct sequence [unbroken by any new independent cause] produces the injury complained of and without which such injury would not have happened." *Id.* at 21 (alterations in original). Consistent with that standard, the Supreme Court of Washington has expressly disavowed the causal-exclusivity standard applied by the district court, holding that "[t]here may be one or more proximate causes of an injury." *Id.*

**2. Under the correct causation standards, Plaintiffs' evidence is sufficient to create a genuine dispute of material fact as to injury causation.**

Applying either California's "substantial factor" or Washington's "but-for" causation standard, the evidence that creates a genuine fact dispute as to causation of Sukumar's injuries under §292 has the same effect under his state-law claims. The mutually corroborating Sukumar and Smith declarations, together with the photographic evidence documenting Sukumar's concerns about Nautilus's patent markings and the extensive evidence of Sukumar's earnest efforts to launch his exercise machine business upon learning that Nautilus's markings were false, is more than enough to require reversal of the summary judgment and remand for resolution of the factual dispute by a jury. *See Frolow*, 710 F.3d at 1311 ("[W]e conclude that Mr. Frolow raised a genuine issue of material fact and reverse the district court's grant of summary judgment.").

### III. On Remand, This Matter Should be Transferred Back to the Central District of California.

Finally, Appellants request that this action be transferred back to the U.S. District Court for the Central District of California, where Plaintiffs reside and where the suit was originally filed.[4] Five months into the litigation—well after the opening of discovery—Nautilus moved to transfer this case to the Western District of Virginia. It claimed that this 2,500-mile move was necessary to secure the testimony of more than 20 witnesses residing in and around Independence, Virginia, the former location of one of its major manufacturing facilities.[5] Nautilus, however, offered no basis for its belief that those witnesses had relevant and material knowledge—and as events proved, they did not.

Despite Nautilus's prejudicial delay and anemic claims of necessity, the Central District of California granted the transfer. This was an abuse of discretion. There is no question that the Central District of California is a proper venue for this action: it is where Plaintiffs reside, where their injuries occurred, and where they

---

[4] Because this issue does not involve substantive patent law, "this court applies the laws of the regional circuit in which the district court sits," *i.e.*, the Ninth Circuit. *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008). Venue-transfer orders are reviewed for an abuse of discretion. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000). "Under § 1404(a), the district court has discretion to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Jones*, 211 F.3d at 498 (internal quotation marks omitted).

[5] Nautilus sold the facility as part of a divestiture in February 2010. A00123.

chose to file suit. Now that this is no longer a *qui tam* action but a tort suit, those factors are entitled to substantial weight in the venue analysis. By contrast, neither Plaintiffs nor Nautilus have any current nexus to the Western District of Virginia, which lies more than 2,000 miles distant from any of the parties. The conventional venue analysis strongly favors returning the case to the Central District of California.

### A. Because this is no longer a *qui tam* suit, Plaintiffs' residence and choice of forum are entitled to substantial weight.

In granting the transfer motion, the Central District declined to give any weight to Plaintiffs' choice of forum, on the ground that Plaintiffs were suing "on behalf of the United States," making the United States the real party in interest and vitiating any need to consider Plaintiffs' preference or convenience. A00033–34. Even if that justification was legitimate at the time the transfer motion was under consideration, it is not applicable now: the *qui tam* provisions of §292 have been eliminated, and Plaintiffs' complaint alleges injuries-in-fact that occurred in the Central District of California. In other words, this lawsuit now sounds in tort—and in tort actions, the locus of the plaintiff's injury and the plaintiff's choice of forum are given heavy weight in determining venue. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981).

**B. Contrary to Nautilus's conclusory assertions below, there are no material witnesses in the Western District of Virginia.**

Further, the district court erred by placing dispositive weight on the need to transfer the case closer to Nautilus's alleged fact witnesses, the quality and materiality of whose testimony the court had no information. While the ability to subpoena non-party witnesses is a legitimate consideration, *see Jones*, 211 F.3d at 499, it only bears upon the transfer analysis to the extent that non-party witnesses in the transferee venue possess *material and relevant* testimony. General claims as to the necessity of a transfer will not do: "If the moving party merely has made a general allegation that necessary witnesses are located in the transferee forum, without identifying them and providing sufficient information to permit the district court to determine what and how important their testimony will be, the motion to transfer should be denied." 15 Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure*, § 3851 (4th ed. West 2014); *see also Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1169 (10th Cir. 2010) ("To demonstrate inconvenience, the movant must … indicate the quality or materiality of [the witnesses'] testimony[.]" (internal quotation marks omitted)).

Nautilus provided no such information here—it spent only five lines of its 30-page motion to transfer discussing the knowledge of these claimed fact witnesses. What little information it provided speaks volumes to how baseless Nautilus's motion was: "[T]hese witnesses—*to the extent they know anything relevant*—

would have the 'key' knowledge, given that they include those who actually manu-factured and assembled the machines, and thus created and affixed the patent labels to the machines at issue[.]" A00113. Nautilus's declarations in support were simi-larly deficient, stating only that it had "provided its counsel with a list of potential individuals who may have information regarding Nautilus' [sic] former patent marking process." A00124. Nowhere in the record does Nautilus provide any-thing beyond cursory supposition as to the necessity of this transfer. This can hardly be said to "provid[e] sufficient information to permit the district court to de-termine what and how important [the witnesses'] testimony will be," and thus the motion to transfer should have been denied. *See* 15 Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure*, § 3851 (4th ed. West 2014).

Time eventually told that which should have been evident: virtually none of the individuals identified by Nautilus actually had any knowledge of its patent-labeling process.[6] These individuals were mostly ground-level workers at the In-dependence plant: sales representatives, purchasing agents, assembly line workers, and the like. A00229–30. Some of Nautilus's claimed "witnesses" lacked a col-lege education, much less the specific technical background necessary to designate patents. *See, e.g.*, A00271–72. Under no stretch of the imagination could these employees have any knowledge of which patents are identified to which product;

---

[6] Though Gregory Webb resided in Virginia and did indeed have relevant infor-mation, he was a willing plaintiffs' witness. *See* A00035 n.1.

rather, they simply "carr[y] the process through, like it's been done for years." A00230.  As the former owner of the Independence plant and employer of these individuals, Nautilus knew or should have known all of this when it filed its motion with the court.

To be sure, Nautilus's laundry list of witnesses was nothing more than a thinly veiled attempt to manufacture jurisdiction in a distant court.  Plaintiffs brought this to the attention of the California court.  A00138–43.  Despite the clear absence of any appreciable connection to the transferee district, the court shipped this case across the country, increasing the burden on Plaintiffs in prosecuting this matter.  This was an abuse of discretion, and this Court should reverse.

## CONCLUSION

For all the reasons given, Plaintiffs-Appellants respectfully ask that the judgment below be REVERSED and the case REMANDED to the District Court for the Western District of Virginia for transfer to the District Court for the Central District of California and a trial on the merits.

Dated: April 18, 2014                    Respectfully Submitted,

                                         /s/ Michael A. Tomasulo

                                         Michael A. Tomasulo*
                                         Winston & Strawn LLP
                                         333 South Grand Avenue
                                         38th Floor
                                         Los Angeles, CA 90071
                                         (312) 615-1700
                                         mtomasulo@winston.com

                                         Steffen N. Johnson
                                         Geoffrey P. Eaton
                                         Winston & Strawn LLP
                                         1700 K Street, N.W.
                                         Washington, D.C. 20006
                                         (202) 282-5705
                                         sjohnson@winston.com
                                         geaton@winston.com

                                         *Attorneys for Plaintiffs-Appellants*

CASE PARTICIPANTS ONLY

# ADDENDUM

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 0 6 2013

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division**

| | | |
|---|---|---|
| PONANI SUKUMAR, | ) | Case No.: 7:11-cv-00218 |
| and | ) | |
| SOUTHERN CALIFORNIA | ) | |
| STROKE REHABILITATION | ) | **ORDER AND FINAL JUDGMENT** |
| ASSOCIATES, INC., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **By: James C. Turk** |
| | ) | **Senior United States District Judge** |
| NAUTILUS, INC., | ) | |
| Defendant. | ) | |

In accordance with the accompanying Memorandum Opinion entered this day, it is hereby **ADJUDGED** and **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 138, is **GRANTED** and Plaintiffs' Motion for Partial Summary Judgment, ECF No. 136, is **DENIED AS MOOT**.

In light of the Court's ruling, judgment is hereby entered for Defendant and the Clerk is directed to **STRIKE** this case from the active docket of this Court. The Clerk is further directed to send a copy of this Order and accompanying Memorandum Opinion to all counsel of record.

**IT IS SO ORDERED.**

**ENTER**: This ___ day of December, 2013.

_James C. Turk_
Senior United States District Judge

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 0 6 2013

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

PONANI SUKUMAR,                    )       Case No.: 7:11-cv-00218
  and                              )
SOUTHERN CALIFORNIA                )
  STROKE REHABILITATION            )       MEMORANDUM OPINION
  ASSOCIATES, INC.,                )
  Plaintiffs,                      )
                                   )
  v.                               )       By: James C. Turk
                                   )           Senior United States District Judge
NAUTILUS, INC.,                    )
  Defendant.                       )
_____)

This matter is before the Court on cross-motions for summary judgment. Plaintiffs

Ponani Sukumar ("Sukumar") and Southern California Stroke Rehabilitation Associates, Inc.

("SCSRA") have filed a renewed motion for partial summary judgment, ECF No. 136, in which

they cite to new evidence in seeking some of the same rulings as a matter of law that the Court

previously denied. See ECF No. 103 (Memorandum Opinion granting in part and denying in part

Plaintiffs' Motion for Partial Summary Judgment, ECF No. 80). Defendant Nautilus, Inc.

("Nautilus") has filed its own summary judgment motion, in which it seeks judgment in its favor

as to all claims asserted by Plaintiffs, primarily on the grounds that Plaintiffs have insufficient

evidence of damages caused by Nautilus's conduct. ECF No. 138. The parties argued both

motions before the Court on September 17, 2013, and the motions are now ripe for disposition.

As explained in more detail below, summary judgment is appropriate as to Plaintiffs'

claim under the federal false patent marking statute, 35 U.S.C. § 292, because Plaintiffs have

produced insufficient evidence of a "competitive injury," which is required to show standing

under the revised statute. Similarly, as to their state law claims under California and Washington

law, the Court concludes that Plaintiffs have failed to put forth sufficient evidence from which a

jury could find that they suffered an injury proximately caused by Nautilus's violations of those statutes. For these reasons, explained in more detail below, Defendant's Motion for Summary Judgment, ECF No. 138, is GRANTED, and Plaintiffs' Motion, ECF No. 136, is DENIED AS MOOT.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

At the outset, the Court notes that the cross-motions and related filings are voluminous, contain extensive exhibits, and address a number of issues that the Court will not reach in this opinion.[1] For example, it will be unnecessary to address Plaintiffs' motion for summary judgment at all (which focuses entirely on issues related to liability), because the Court's conclusions as to damages render Plaintiffs' motion moot. Accordingly, in discussing the factual background of the case, the Court focuses on the background most pertinent to the issues in this opinion and omits a discussion of the background related to many other legal issues raised by the parties. Primarily, the Court focuses on the facts related to damages, since the lack of proof of damages caused by Nautilus's conduct is the basis of the Court's ruling.

Nautilus is a publicly-traded American corporation, headquartered in Vancouver, Washington. ECF No. 138-6, Murdock Decl. at ¶ 2. It has been in the exercise and fitness equipment industry for over twenty-five years and develops, manufactures, and markets several

---

[1] The parties' briefing in this case has included not only the usual response and reply to each motion, but also documents objecting on various grounds to certain evidence and testimony submitted by the opposing party. Also, Defendant has filed a request for judicial notice as to several documents, ECF No. 138-7 at 2-3, and a separate statement of undisputed facts with supporting record citations. Plaintiffs object to the separate statement of facts on various grounds, including that it is "unauthorized" by this Court's local rules. ECF No. 155 at 2. They further argue that the statement lacks relevance and that it is "ambiguous; unintelligible; misleading; and containing disputed facts." Id. The fact that the local rules do not contemplate the filing of such a separate statement does not render the statement unauthorized and the Court has considered it, but merely as a guide to the record. As with any summary judgment ruling, the Court bases its decision only on competent summary judgment evidence. See Fed. R. Civ. P. 56.

2

different lines of fitness products both domestically and internationally. Id. at ¶¶ 2-3. It sells its products directly to consumers through television advertising, catalogs, and the Internet, and also offers products through a network of independent retail companies with stores and websites. Id. at ¶ 3.

Plaintiff Ponani Sukumar is an individual and California resident. ECF No. 138-3, Sukumar Dep. at 13.[2] He founded Plaintiff Southern California Stroke Rehabilitation Associates, Inc. ("SCSRA") in 2004 and is its President. Id. at 13-14, 46. When SCSRA was established, Sukumar intended to utilize the corporation to eventually open approximately 70 stroke rehabilitation centers to treat elderly and medical patients. Id. at 63, 66. His motivation for establishing SCSRA stemmed from his personal experience, starting in 1994, with his elderly father's illnesses. ECF No. 150-10, Sukumar Decl. at ¶ 6.[3] As part of his attempts to help his father regain functionality, he "concluded that strength training equipment would form the nucleus" of his father's rehabilitation plan. Id. When he founded SCSRA, he intended to use strength training equipment in SCSRA's centers, as well. Id. at ¶ 13; see also Am. Compl. ¶¶ 25-29 (explaining that SCSRA was founded in order to generate profit by offering "'traditional' physical rehabilitation in addition to other treatment modalities, including diet, mental and spiritual wellness"; the physical rehabilitation program would use specific types of exercise

---

[2] References to "Sukumar Dep." herein refer to the excerpts attached to Nautilus's memorandum, at ECF No. 138-3. Plaintiffs have separately filed a one-page excerpt from the deposition, see ECF No. 150-7, but that page is included in ECF No. 138-3, as well.

[3] As Nautilus points out, Sukumar's deposition testimony is not always consistent with his later-filed declaration, and Nautilus has requested that the Court strike the declaration in its entirety or disregard it. ECF No. 153 at 6-7 (citing Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) and other authority for the proposition that a party may not create a dispute of fact for summary judgment "simply by submitting an affidavit contradicting his own prior testimony"). The Court agrees that portions of the declaration contradict Sukumar's sworn deposition testimony and thus cannot be considered. Barwick, 736 F.2d at 960. Some of what Nautilus deems to be "conflicting" testimony, however, appears to the Court to simply be clarifying or elaborating on deposition testimony. To the extent that declaration simply elaborates on Sukumar's deposition testimony, but does not contradict it, the Court considers it.

3

equipment that would work for "frail elderly clients with limited physical strength" and contain certain safety features to "protect compromised clients").

Sukumar explains that he was "most interested in the use of the Arthur Jones inspired core designs of Nautilus's 2ST and [Next Generation ("NG") lines of] machines," but that he believed those machines would have to be modified in order to properly serve the senior fitness and rehabilitation market. Id. at ¶¶ 6, 8. These modifications included features designed to assist elderly or infirm patients to use them safely. See id. at ¶¶ 7-8. Sukumar avers that since the late 1990s, he has "formed and continually refined, very specific concepts and criteria for machines in the senior fitness market." Id. at ¶ 7.

As part of his research, Sukumar purchased a number of different exercise machines from Nautilus and other manufacturers. Id. at ¶ 23(c).[4] SCSRA currently owns approximately 110-120 Nautilus machines that have been purchased either directly by SCSRA or purchased by Sukumar and ownership transferred to SCSRA. Sukumar Dep. at 96-97. Approximately 50-55 of the machines that are the subject of this lawsuit were purchased within the five-year period preceding the filing of suit and are therefore within the applicable statute of limitations. Id. at 148.

Pertinent here, Sukumar claims that in the course of investigating Nautilus machines, he was several times told by Nautilus employees or representatives that Nautilus machines were patented and that Nautilus vigorously protects the machines from patent infringement. Sukumar Decl. at ¶¶ 9-10. Additionally, the Nautilus machines at issue in this lawsuit contained patent labels. Although Nautilus repeatedly points to a portion of Sukumar's testimony as him "conceding" that he did not even look at the patent labels until after he had purchased them, that

---

[4] One of the orders from another company also resulted in litigation brought by Sukumar. See Sukumar v. Health Tech Res., Inc., 2013 WL 930619 (Cal. Ct. App. Mar. 29, 2013).

4

testimony cannot bear the weight Nautilus assigns it. As explained in Plaintiffs' response, see ECF No. 150 at 24-25, defense counsel's questioning did not ask Sukumar to identify each and every instance he had looked at the patent labels, nor did Sukumar testify that the one instance he mentioned of reviewing the labels was the only time he had looked at them. Moreover, there is additional evidence (including photographs of patent labels taken around 2003) that Sukumar looked at patent labels prior to purchasing the machines at issue in this lawsuit.

As this Court has already ruled, at least some of the patent labels on the machines were false, in that they listed patents that did not apply to that particular machine. Specifically, nine of the machines Nautilus manufactured at its Independence, Virginia plant—six strength machines and three cardiovascular machines—were unpatented and falsely marked. See ECF No. 103 at 5-8. The six strength machines contained labels referencing at least eight inapplicable patents (of twenty-four listed on the label). Likewise, the cardio machines contained labels referencing at least eight inapplicable patents (of sixteen listed on the label). Id.

In addition to purchasing off-the-shelf Nautilus equipment, Sukumar also placed several orders in 1998 and 1999 for a number of customized Nautilus machines that he claims incorporated "certain of [his] innovations." Sukumar Decl. at ¶ 9. He was dissatisfied with the machines as delivered, id. at 11, 15, 23, and eventually filed a breach of contract action against the distributor of those products, Med-Fit Systems, Inc., and against Nautilus, who Sukumar claimed induced Med-Fit to breach its contract with him. See, e.g., Sukumar v. Med-Fit Sys., Inc., 2012 WL 1534098, at *1 (Cal. Ct. App. May 2, 2012). Portions of that case were tried to two different juries and both times, the jury ruled against Sukumar. Id., at *1. He appealed, but the final judgment was affirmed on appeal. See id.

In his declaration, Sukumar claims that around October 2001 and again around February

5

of 2002, he had a "plan to build, deploy, and sell my machines" that would "pitch [him] into direct competition with Nautilus." ECF No. 150-10, Sukumar Decl. at ¶ 11.[5] Because of the patent labels on the machines, however, and the statements by a former Nautilus employee, he thought "obtaining a license was not only required, but . . . also . . . the fair and prudent thing to do." Id. at ¶¶ 11-12. Sukumar testified that he twice sought a license from Nautilus so that he could use Nautilus machines and modify them to his satisfaction, "once in 2004, just before the Direct Focus trial, and once in 2009 through [his] Jones Day lawyers." Sukumar Dep. at 110. At least one of these requests was in the context of a settlement discussion with Nautilus over pending litigation. See Ex. 1 to Sukumar Decl. He now claims that, had he known those machines were not patented—an understanding he claims he has just recently reached as a result of the Court's February 2012 Order—he would have built his own machines at that time *for selling to others* and thus competed directly with Nautilus. This testimony, however, is contradicted by the terms he offered in the settlement letter from his attorneys, in which he claimed he wanted to license Nautilus technology solely for use in SCSRA centers and makes no mention of selling exercise equipment. It also conflicts with his deposition testimony in this case, when he testified that he now has an intention to manufacture and sell his customized machines, but has had that intent only since February 2012.

Additionally, although Sukumar avers he has been working on his modified equipment designs since the late 1990s, he also admitted at his deposition a number of facts that show that neither Sukumar nor SCSRA is presently a competitor of Nautilus. In particular, Sukumar testified that:

- SCSRA has no other employees other than Sukumar (Dep. at 14);
- neither he nor SCSRA has actually created or opened any senior

---

[5] As discussed below, this allegation contradicts Sukumar's deposition testimony.

spa centers or any stroke rehabilitation centers (Sukumar Dep. at 66-67);

- neither he nor SCSRA have sold any specifically-modified Nautilus equipment, or any machines of his own design and manufacture (Sukumar Dep. at 167, 169, ECF No. 138-4, SCSRA Dep. at 253-54);

- neither he nor SCSRA hold any patents on fitness equipment (Sukumar Dep. at 190);

- SCSRA has not realized a profit in any given year since its inception (SCSRA Dep. at 259); and

- the protocol that Sukumar has developed for assisting patients is not written, but "in [his] mind and [he] put it in effect in the case of [his] father" and discussed it with people (Sukumar Dep. at 171).

Nautilus summarizes these admissions by describing Sukumar as an individual with a "non-functioning business" and contends that, even if SCSRA were in business, it would not operate in the same commercial market as Nautilus." ECF No. 138 at 16, 18, 50. That is, Nautilus manufactures and sells equipment; SCSRA would merely use equipment or make it to use in its own centers.

To counter these facts, Plaintiffs emphasize in their opposition all the efforts they have made since the Court's February 2012 opinion ruling the machines at issue are falsely marked. Sukumar's Declaration, for example, claims that since this Court's February 2012 Order on Plaintiffs' partial summary judgment motion when he learned for certain that the accused machines were falsely marked, Plaintiffs have taken steps and invested time, energy, and resources to become a fitness equipment manufacturer. Sukumar Decl. at 14-15. These include "retain[ing] the services of John Whitman" to "obtain updated research on the senior fitness market" and working to develop a comprehensive business plan that includes "designing, manufacturing, and selling my own line of fitness equipment." Id. at 15. SCSRA is also working with a design house in Utah and two overseas manufacturers to develop prototypes and

7

manufacture a line of fitness equipment based on Nautilus's core designs. Id. Plaintiffs are in the process of retaining other industry professionals and have "engaged with Gregg Hamann" to purchase land for a California manufacturing facility, with space for "offices, research & development, prototyping fitness equipment, and manufacturing fitness equipment." Id. According to Plaintiffs, these recent efforts support their claim that, were it not for the false patent labels, they could and would have engaged in such efforts previously. Id. at 15-16 (claiming that the false marking impeded Plaintiffs "from building machines based upon the core design elements of Nautilus's NG and 2ST lines of equipment, thereby delaying our entry into this market by nearly 15 years").

Plaintiffs also contend that they have suffered a "variety of cognizable harms directly because of Nautilus's violation of the false marking statute." ECF No. 150 at 5. They specifically identify the following as "competitive injuries" and damages:

    i.    Nautilus's false marking deterred and delayed Plaintiffs' entry into the fitness equipment market;

    ii.    Plaintiffs incurred unnecessary expenses in attempting to license Nautilus patents;

    iii.    Plaintiffs incurred unnecessary expenses in attempting to purchase Nautilus patents/assets;

    iv.    Plaintiffs incurred unnecessary expenses in exploring the potential purchase of MedX Corporation, a premium fitness equipment manufacturer, to enter the business of manufacturing and selling fitness equipment;

    v.    Plaintiffs incurred unnecessary expenses in analyzing the validity and enforceability of the falsely marked patents; and

    vi.    Plaintiffs incurred unnecessary expenses in storing machines they acquired.

Id.

8

In addition to Sukumar's declaration as to these alleged injuries, Plaintiffs have also submitted the affidavit and report of a purported valuation expert, James Pampinella.[6] Pampinella opines that, as a result of the Nautilus's false marking, Plaintiffs have incurred between $94,000 to $142,700 in "unnecessary legal costs," $132,000 in the unnecessary purchase and modification of MedX Machines, and $242,000 in unnecessary storage costs, for a total amount of estimated damages of $468,164 to $516,679.

### B. Procedural History

As alluded to above, this lawsuit is not the first between the parties, nor is it the only one currently pending. Instead, there is a thirteen-year history of litigation brought by one or both of the Plaintiffs against Nautilus.[7] Prior complaints brought in both state and federal courts have included claims for breach of contract, breaches of warranty, and fraud. See ECF No. 138 at 1 & cases cited in n.1.

The Plaintiffs originally filed the instant suit against Nautilus in the Central District of California, accusing it of falsely marking a number of its machines in violation of 35 U.S.C. § 292 ("Section 292"). See Compl., ECF No. 1. On Nautilus's motion, ECF No. 20, the case was transferred to this District, in part because the accused machines were manufactured at a former Nautilus plant located in Independence, Virginia. See ECF No. 34. This Court then stayed the

---

[6] Nautilus objects to Pampinella's report on various grounds. The Court has considered the affidavit, but concludes that it does not provide any competent evidence that Plaintiffs' alleged injuries were caused by Nautilus's false marking. Thus, it does not prevent the grant of Defendant's summary judgment motion.

[7] The Court mentions these prior lawsuits not because it agrees with Defendant's allegations that Plaintiffs are seeking "payback" or engaged in a "long litigation war of attrition," ECF No. 138 at 9, but because some of the claims Plaintiffs made in these other lawsuits are inconsistent with claims asserted in the instant case, as discussed herein. Indeed, the Court does not accept Nautilus's interpretation of the instant lawsuit as Plaintiffs' attempts at "payback" or vendetta litigation, particularly given the Court's prior ruling that some Nautilus machines were in fact falsely marked. But the parties' relationship is certainly not a friendly one—even Sukumar acknowledges that he is "deeply aggrieved" and personally offended by Nautilus's conduct. In his declaration, he avers that "Nautilus has repeatedly denigrated [his] attempts to pursue [his] goals." Sukumar Decl. at 17.

A00010

action for approximately two months in 2011, pending final Congressional action on legislation that could affect the outcome of the case. See ECF No. 51.

On September 16, 2011, President Obama signed into law the Leahy-Smith America Invents Act ("AIA"), which amended Section 292 to eliminate its *qui tam* provisions and include a competitive injury requirement for private plaintiffs. The amendment applied to all cases pending on that day, or filed after that day.[8] In response, the Plaintiffs filed a First Amended Complaint explicitly alleging competitive injury and adding California and Washington state law claims. In their First Amended Complaint, Plaintiffs assert four causes of action:

> (1) false patent marking in violation of 35 U.S.C. § 292;
>
> (2) false advertising under California law (Cal. B. & P. Code § 17500);
>
> (3) unfair/unlawful business practice under California Law (Cal. B. & P. Code § 17500); and
>
> (4) violation of the Washington Consumer Protection Act (Wash. RCW § 19.86.020).

ECF No. 69. In a prior order granting in part and denying in part Plaintiffs' partial summary judgment motion, the Court ruled as a matter of law in Plaintiffs' favor on some aspects of those claims, including a ruling that some of the accused machines were falsely marked.[9] ECF No.

---

[8] The Supreme Court recently denied certiorari in a case that sought review of the Federal Circuit's ruling that the retroactive elimination of *quit tam* status did not violate due process rights. See Public Patent Foundation Inc. v. McNeil-PPC, Inc., 134 S. Ct. 319 (Oct. 7, 2013) (order denying petition for writ of certiorari); see also Brooks v. Dunlop Mfg. Inc., 702 F.3d 624, 625-26 (Fed. Cir. 2012) (expressing holding of Federal Circuit).

[9] Specifically, the Court ruled that:

> (1) Defendant falsely marked unpatented articles (certain of the accused machines) within the meaning of Section 292 of Title 35 of the United States Code;
> (2) Defendant intended to dispose of real or personal property within the meaning of Section 17500 of the California Business and Professions Code;

10

103. Neither party is asking the Court to revisit these rulings, and they have no bearing on the issues of damages on which the Court grants summary judgment. Put differently, because of the lack of any actual damages or harm to Plaintiffs caused by Nautilus's false marking, it is immaterial—for purposes of this opinion—whether Defendants falsely marked their products and whether they did so with an intent to deceive, and whether any of the state law statutes were violated by Nautilus's conduct.

## II.  STANDARD OF REVIEW

"[T]he function of a motion for summary judgment is to smoke out if there is any case, i.e., any genuine dispute as to any material fact, and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition." Bland v. Norfolk & S. R. R. Co., 406 F.2d 863, 866 (4th Cir. 1969). Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a summary judgment motion, the court must consider the evidence in the record as a whole, see Ricci v. DeStefano, 557 U.S. 557, 586 (2009), and must draw "all reasonable inferences . . . therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Summary judgment should be entered if the Court concludes that no reasonable jury could return a verdict for the non-moving party. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996).

---

(3) Defendant's false marking was committed in the conduct of any trade or commerce, within the meaning of Section 19.86.020 of the Revised Code of Washington; and
(4) Defendant's false marking impacted the public interest within the meaning of Section 19.86.020 of the Revised Code of Washington.

ECF No. 103.

11

## III.   DISCUSSION

### A. The False Marking Statute (35 U.S.C. § 292)

An entity violates Section 292 when it (1) falsely marks an unpatented article; and (2) does so for the purpose of deceiving the public. 35 U.S.C. § 292(a). As the Court has noted, the statute was revised in 2011 to require that where, as here, a private actor instead of the government is suing to enforce a violation of the statute, that actor must have suffered "competitive injury." 35 U.S.C. § 292(b).

The Congressional history of the AIA is clear that the purpose of including the "competitive injury" was to eliminate *qui tam* actions because of the prevalent abuse of such actions. As one Senator explained, "Currently, such [*qui tam*] suits are often brought by parties asserting no actual competitive injury from the marking—or who did not even patent or manufacture anything in a relevant industry. Many cases have been brought by patent lawyers themselves claiming the right to enforce a fine of $500 for every marked product." 157 Cong. Rec. S5319-5321, at 5320 (daily ed. Sept. 6, 2011)(statement of Sen. Kyl); see also Fisher-Price, Inc. v. Kids II, Inc., 2011 WL 6409665, at *9 (W.D.N.Y. Dec. 21, 2011)(citing same); RB Rubber Prods., Inc. v. ECORE Int'l, Inc., 2012 WL 4068557, at *9 (D. Or. Sept. 14, 2012)(citing same). Certainly, this confirms that the amendment was intended to eliminate plaintiffs with no connection to the false marking and to limit private plaintiffs permitted to sue under § 292 to a specific group: persons or entities who could show a competitive injury from the false marking. The question before the Court is whether Plaintiffs here are included in that group.

Nautilus contends that Plaintiffs cannot show a "competitive injury" and thus that their

false marking claims fail as a matter of law.[10] Nautilus focuses primarily on the fact that neither Sukumar nor SCSRA is a competitor of Nautilus. It also contends that neither Plaintiff has suffered any injury as a result of any false marking. In support of these points, Nautilus relies heavily on the sworn deposition testimony of Sukumar and on his testimony as the corporate designee of SCSRA. In particular, Nautilus focuses on his admissions that neither Plaintiff has ever manufactured or sold a single piece of exercise equipment and that they hold no patents related to any such equipment. Thus, Nautilus challenges Sukumar's assertion that Plaintiffs "compete" with Nautilus both as disingenuous and as defying common sense.

Nautilus argues that Plaintiffs have failed to identify any specific instances of competitive loss and, in particular, have failed to prove that it was the patent labels that caused any injury to their business. Nautilus emphasizes that the patent labels themselves were not the source of any impediment to Plaintiffs' business expansion. Nautilus further posits that any assertions Plaintiffs "overpaid" for any given machine because they believed it was covered by patents and it was not, just shows they were consumers, not competitors. Nautilus also maintains that Plaintiffs' argument that the patent labels prevented them from entering the market is contradicted by their claims made in other litigation as well as Sukumar's testimony here.

In response, Plaintiffs assert that they suffered a "competitive injury" within the meaning of the false marking statute because as a potential competitor, they were competitively injured when they were impeded in their efforts to enter the market and incurred "unnecessary costs." ECF No. 150 at 7-10 (citing Forest Group, Inc. v. Bon Tool Co., 590 F.3d 1295, 1303 (Fed. Cir. 2009)). They also point to the categories of damages described above as their specific and non-speculative losses allegedly caused by the false marking.

---

[10]  In light of its ruling, the Court does not address Nautilus's separate arguments that Sukumar, as an individual, has no standing and no damages in light of the fact that he does not personally own any of the accused machines.

In support of their position, Plaintiffs rely most heavily on <u>Forest Group</u>, <u>supra</u>, a pre-AIA decision from the Federal Circuit. In discussing the purpose and policies behind the false marking statutes, the <u>Forest Group</u> Court explained:

> The marking and false marking statutes exist to give the public notice of patent rights. "Congress intended the public to rely on marking as a 'ready means of discerning the status of intellectual property embodied in an article of manufacture or design.'" <u>Clontech Labs</u>. [v. Invitrogen Corp., 406 F.3d 1347, 1356 (Fed. Cir. 2005)] (quoting <u>Bonito Boats, Inc. v. Thunder Craft Boats, Inc.</u>, 489 U.S. 141, 162 (1989)). Acts of false marking deter innovation and stifle competition in the marketplace. 7 Donald S. Chisum, <u>Chisum on Patents</u> § 20.03[7][c][vii] (2009). If an article that is within the public domain is falsely marked, **potential competitors may be dissuaded from entering the same market**. False marks may also deter scientific research when an inventor sees a mark and decides to forego continued research to avoid possible infringement. <u>See</u> Bonnie Grant, <u>Deficiencies and Proposed Recommendations to the False Marking Statute: Controlling Use of the Term "Patent Pending"</u>, 12 J. Intell. Prop. L. 283, 283 (2004). False marking can also cause unnecessary investment in design around or costs incurred to analyze the validity or enforceability of a patent whose number has been marked upon a product with which a competitor would like to compete. <u>Cf. Clontech Labs.</u>, 406 F.3d at [1357] n. 6 ("In each instance where it is represented that an article is patented, a member of the public desiring to participate in the market for the marked article must incur the cost of determining whether the involved patents are valid and enforceable.").

590 F.3d at 1302-03 (emphasis added).

Although Plaintiffs strain to urge that the emphasized language above is applicable here and supports their claims, that language must be understood in its proper context. Perhaps most importantly, <u>Forest Group</u> was decided before the AIA, and the issue before the court was whether the $500 fine in the statute should be applied on a per article basis. Thus, in no way was the issue presented here implicated in that case. Additionally, it was undisputed that there, the

parties were in fact competitors.[11] See 590 F.3d at 1299. Notably, moreover, the discussion in that portion of the opinion was focused on the general harms from false marking. Indeed, some of the precise harms that Plaintiffs claim here, e.g., unnecessary investment in design around costs, or costs incurred to analyze the validity or enforceability of patents, are described in Clontech Labs as hurting "a member of the public [who] desir[es] to participate in the market for the marked article." 406 F.3d at 1357 n.6 (emphasis added). Those harms would not be competitive injuries, therefore, but instead harms suffered by the general public. Finally, what that excerpt does not say is also significant. While the Forest Group court recognized that a harm from false marking is that potential competitors may be dissuaded from entering the same market, it did not state that such a harm would constitute a "competitive injury."

At the oral arguments held before the Court, both parties acknowledged that the issue of whether a potential competitor can assert a claim under the amended statute has not yet been addressed explicitly by any court and that it is thus an issue of first impression. Although they have not addressed directly whether a potential competitor can suffer a "competitive injury," a number of federal district courts have attempted to define or discuss what the term means in the context of Section 1292. For example, in Greene v. Ab Coaster Holdings, Inc., 2012 WL 4442749 (S.D. Ohio Sept. 25, 2012), the Court explained:

> The statute does not define competitive injury, however, 'competitive injury' has been generally defined as '[a] wrongful economic loss at the hands of a commercial rival ....' " U.S. ex rel. FLFMC, LLC v. TFH Publications, Inc., No. 10–CV–5477, 2012 WL 1337557, at *4 (D.N.J. Apr 18, 2012) (citing Black's Law Dictionary 302 (8th ed. 2004). See also Rogers v. Conair Corp., No. 10–1497, 2012 WL 1443905, at *4 (E.D. Pa. Apr. 25, 2012) ("To establish standing under the [America Invents Act], Plaintiff

---

[11] Forest Group, Inc., the defendant on the false marking claim, was a licensor, manufacturer, and seller of the stilts bearing the patent label. Bon Tool Co., the plaintiff in the false marking claim, was a tool reseller who purchased replica stilts from another manufacturer without a license from Forest Group. 590 F.3d at 1299.

must allege a tangible economic loss caused by the illegal competitive means (*i.e.*, the false patent marking).") (citing Advanced Cartridge Tech., LLC v. Lexmark Int'l, Inc., No. 10–486, 2011 WL 6719725, at *2, 4 (M.D. Fla. Dec. 21, 2011) and Fisher–Price, Inc. v. Kids II, Inc., No. 10–988, 2011 WL 6409665, at *9 (W.D.N.Y. Dec. 21, 2011)). "Formulated differently, a competitive injury is a business loss caused by a competitive means, including false patent marking, that the law forbids." Advanced Cartridge Tech., LLC, 2011 WL 6719725, at *2 (citation omitted).

Greene, 2012 WL 4442749, at *11.

Selecting particular language from any of those cases cited in Greene above, or from any of the cases cited by the parties, can easily result in a sense that either Plaintiffs or Nautilus are "right" on the law concerning potential competitors. For example, some cases contain language that seems clearly limited to those already competing in some way. See, e.g., FLFMC, LLC, 2012 WL 1337557, at *4 (a competitive injury "has been generally defined as '[a] wrongful economic loss at the hands of a commercial rival"); RB Rubber Prods., Inc., 2012 WL 4068557, at *9 (surveying post-AIA decisions and concluding that "competitive injury exists where the parties are in competition in the relevant market and the alleged false marking harms the plaintiff's ability to compete"). The RB Rubber Prods. Court also noted that courts have drawn analogies to the Lanham Act, which creates a rebuttable presumption of competitive injury where the parties are competitors and the alleged conduct has the tendency to confuse consumers. Id. at *9;[12] see also Ira Green, Inc. v. J.L. Darling Corp., 2011 WL 6218146, at *4 (W.D. Wash. Dec. 5, 2011) (applying, in false marking context, Ninth Circuit's definition of competitors under the Lanham Act as those who "vie for the same dollars from the same consumer group") (citation omitted).

---

[12] RB Rubber Prods. involved two parties who were clearly competitors because "they manufacture[d] similar and competing products." 2012 WL 4068557, at *9. Thus, as with the other cases cited herein, the Court there had no occasion to address whether a competitive injury could occur where a party is a potential competitor only.

16

Other cases contain language that at least does not exclude potential competitors. See, e.g., Rogers, 2012 WL 1443905, at *4 (competitive injury requirement is satisfied if plaintiff suffers a "business loss" caused by a forbidden competitive means, "i.e., the false patent marking"). In at least two cases, moreover, district courts employed reasoning suggesting that a plaintiff could suffer a competitive injury by being prevented from entering a market. Specifically, in both Greene and Kids II, the party asserting the false marking claim was actually selling a product that was a competing product. In both cases, the courts determined that because the party seeking relief had not shown "it was actually deterred from competing in the market by an injury caused by allegedly false patent markings," no competitive injury had been shown. Greene, 2012 WL 4442749, at *13-14; Kids II, 2011 WL 6409665, at *9-10. Put differently, because the plaintiff actually entered the marketplace and sold competitive products, they had not shown that they were prevented from entering the relevant market and not shown a competitive injury. Plaintiffs point to those decisions as supporting their claims because, while Plaintiffs are not yet competing with Nautilus, they have alleged that they were prevented from doing so because of Nautilus's actions in claiming patent protection for machines via their labels where there was no such protection. That is, Plaintiffs contend they were unable to enter the marketplace and thus that their situation is the converse of the plaintiffs' situation in Greene and Kids II.

The Court understands that the issue of whether potential competitors may suffer a competitive injury under Section 292 is both an issue of first impression and perhaps an interesting legal issue. In the case before it, however, the Court need not rule that a potential competitor can never state a claim for competitive injury, or that a plaintiff must already be a competitor or commercial rival to suffer a competitive injury. Instead, the Court simply

17

concludes that here, based on the specific facts before it, no reasonable jury could find that these specific Plaintiffs have suffered a competitive injury caused by Nautilus's false marking. That is, the Court is firmly convinced that Plaintiffs here have not made any such showing and that no reasonable jury could find that Plaintiffs' failure to compete or any of their claimed damages are a "competitive injury" resulting from Nautilus's false marking.

To explain why, the Court addresses first the overall claim that Plaintiffs were prevented from entering the market and competing with Nautilus, a claim that underlies all of their damages claims as a factual matter. It will then address Plaintiffs' remaining claimed injuries.

### 1. Prevention of Entry into the Market

Greene and Kids II, the two cases offering some implicit support for Plaintiffs' argument that being prevented entry into the market could constitute a competitive injury, involved actual competitors. Thus, they did not address what being prevented from entering a market means in the context of a potential competitor. At a minimum, however, the Court believes it must mean that the entity was capable or able to compete (or actively trying to do so), but that the false marking impeded those efforts in some concrete way. A competitor must do more than show it had a desire to compete, and that it did not attempt to compete out of a fear of infringing another's patent. This minimal showing is all that Plaintiffs have made, however, and thus their claim of being prevented entry into the market as a result of the false marking fails.

It is true that Mr. Sukumar has alleged that Nautilus's false marking deterred and delayed Plaintiffs from entering the marketplace, and testified generally that his fear of infringing on what he believed to be valid patents on various machines deterred and delayed Plaintiffs. But his conclusory testimony is not enough to defeat summary judgment. See Dash v. Mayweather, 731 F.3d 303, 325 (4th Cir. 2013) ("Conclusory allegations and speculative assertions ... without further legitimate support clearly do not suffice to create a genuine issue of material fact.")

18

(citations and alterations omitted). It simply defies common sense to conclude that, for more than ten years, Plaintiffs have not entered the market to compete with Nautilus and that the sole item holding them back was their fear of infringing patents that were falsely listed on the accused machines' patent labels.[13]

Moreover, the subjective fear that, by entering a market you may infringe upon another's patent, is insufficient to establish a "competitive injury." If it were sufficient, Section 292 would allow a very broad category of plaintiffs indeed—anyone who simply states that they had the ambition or desire to compete, but were afraid of infringing a patent that turned out to be falsely marked. Indeed, the Federal Circuit has rejected a subjective fear of a patent infringement action as a sufficient injury to convey standing. See, e.g., Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1338-39 (Fed. Cir. 2008) ("[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm" sufficient to establish standing) (citing Lair v. Tatum, 408 U.S. 1, 13-14 (1972)); Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.3d 879, 883 (Fed. Cir. 1985) (a "purely subjective apprehension of an infringement suit is insufficient to satisfy the actual controversy requirement" to establish standing). In short, finding a "competitive injury" because a plaintiff subjectively feared infringing and thus did not enter the market, would eviscerate the "competitive injury" requirement. Thus, this first category of supposed "competitive injury" is not one that can support Plaintiffs' false marking claim.

Sukumar may well have the best of intentions, and grand designs, plans, and excellent

---

[13] Nautilus describes this in more stark terms: "Plaintiffs' purported injuries and every related allegation of "damage" depends on a single, unreasonable presumption: that if only Nautilus had placed accurate labels on the exercise machines, Plaintiff[s] would have (1) started a major business; (2) succeeded in creating the business; (3) entered Nautilus's marketplace in the fitness industry (despite the fact Plaintiffs claim to be trying to enter an entirely different market); and (4) would have then become a "powerful" competitor of Nautilus. ECF No. 151 at 3-4.

A00020

ideas about how to compete with Nautilus. And it may well be that he has now begun in earnest—since this Court's February 2012 opinion—to turn those dreams into reality. But concerted efforts <u>after</u> a lawsuit is filed or a partial decision rendered is not proof a jury can rely on to determine that the reason those efforts were not taken sooner was because of false patent labels.[14] This is particularly true because Sukumar has repeatedly blamed other actions of Nautilus—not any false patent labels—for the years of delay in accomplishing his business objectives and he has done so both in prior litigation and in his deposition in this case. For example, Sukumar's deposition testimony contains repeated references to his fervent belief that Nautilus's conduct other than false marking, including its unwillingness or inability to provide satisfactorily-modified equipment, has impeded his progress and efforts toward establishing a successful business. <u>See, e.g.</u>, Sukumar Dep. at 68 (blaming Nautilus's non-delivery of equipment for "stym[ing]" Plaintiffs' efforts to create documents comparing the projected costs or expenses of stroke rehabilitation facilities versus senior spa centers); <u>id.</u> at 170 (blaming Nautilus's late delivery and failure to deliver products as promised originally for delaying his father's treatment); <u>cf. id.</u> at 184 (claiming he has "an intent to now" sell machines to compete with Nautilus after being "thwarted for 12 years"); <u>id.</u> at 193-94 (reaffirming his trial testimony from September of 2010 that the reason he didn't go forward with his stroke rehabilitation center plans (which had been on hold for close to eight or nine years at that point) was because he had not received seven next generation machines and then explaining that there are a "lot of issues involved in going forward" and that it will now finally happen because he knows the machines are not patented); <u>id.</u> at 194 (claiming he "was duped for all this time").

While Sukumar may sincerely believe that Nautilus, through its conduct, has repeatedly

---

[14] They are also insufficient, in and of themselves, to establish an injury, since questions of standing are viewed as of the time the complaint is filed. <u>See</u> <u>Payne v. TR Assocs., LLC</u>, 880 F. Supp. 2d 702, 706 (E.D.N.C. 2012).

sabotaged SCSRA's development, it requires a great amount of imagination, and leaps wholly unsupported by the factual record before the Court, to conclude that if not for Nautilus's <u>false marking</u> of its machines, the road to Plaintiffs' development of competing machines and rehabilitation or spa centers would have been swift and easy and that SCSRA would be competing with Nautilus today. Any "competitive injury" is simply not supported by the evidence before the Court and would require the jury to engage in impermissible speculation and conjecture. In short, Plaintiffs are neither current competitors nor sufficiently close to competing (and certainly not at the time the First Amended Complaint was filed) that they can prove a "competitive injury."

Plaintiffs' complaints of competitive injury based on being deterred from entering the market fail for the additional reason that there is insufficient evidence—aside from Sukumar's protestations in his declaration[15]—that Plaintiffs ever intended to compete with Nautilus in the relevant market of manufacturing and selling exercise equipment prior to filing this lawsuit. Instead, Sukumar claims he <u>began</u> to compete after learning, from this Court's prior order on Plaintiffs' motion for summary judgment that Nautilus's patent labels were false. Specifically, he testified at his deposition that he previously sought a license from Nautilus to manufacture machines that would be "used exclusively in facilities owned by SCSRA" (<u>i.e.</u>, not sold to others), but that he decided <u>after</u> this Court's February 2012 order that he would "make [his] own machines [for resale] and further [his] business prospects that way." Sukumar Dep. at 161. In the same answer, he confusingly states that making machines for resale was also part of his "other prior intent," but he indisputably states that the licensing, for example, was sought solely to have

---

[15] There is also testimony from Mr. Smith, a former Nautilus representative, that Sukumar told him in 2001 and 2002 that he wanted to design, manufacture, and sell senior fitness equipment. But Sukumar himself has admitted that was not the case until after the lawsuit was filed. His admission is controlling.

machines to use in SCSRA facilities. This testimony establishes that, neither at the time they filed their lawsuit, nor when they first amended to state a "competitive injury," did Plaintiffs intend to compete in the relevant market in which Nautilus operates–the sale of exercise equipment.[16]

While Plaintiffs' aims may now have morphed into wanting to manufacture and sell exercise equipment, the ever-changing aims and goals of SCSRA are further proof that Plaintiffs were not sufficiently established as a business that they suffered a "competitive injury" as a result of Nautilus's false marking.[17] Although Sukumar alleges that he has been deterred from competing with Nautilus market because of the patent labels (which he now knows are incorrect), it is not at all clear to the Court that, even if all of SCSRA's plans had been realized, it would be competing in the same market as Nautilus. Put differently, although he now claims he wants to manufacture and sell equipment directly to consumers or retailers, his testimony in other lawsuits and in his deposition in this case, suggest that was not Plaintiffs' aim or intention, at least not until after this lawsuit was filed. Whatever the limits of a potential competitor's claim of "competitive injury," such an injury cannot include an entity that does not even decide it wants to compete in the relevant market until after its false marking lawsuit is filed. A plaintiff cannot create a "competitive injury" by intentions or business plans or the hiring of consultants, when those efforts begin after a lawsuit has been filed. For all of these reasons, the Court

---

[16] Sukumar alleges in his declaration that SCSRA intends to also sell and manufacture its modified equipment, but that was not the focus of the SCSRA as described in previous cases or as fairly gleaned from his deposition testimony. As noted supra at note 2, to the extent that his declaration is inconsistent with his deposition testimony, the latter controls.

[17] In their reply, Nautilus relies on the lack of any intention to compete in the relevant market until after the Court's February 2012 Order as a lack of standing. See ECF No. 151 at 33-36. However analyzed (whether as a lack of statutory or prudential standing, see generally Advanced Cartridge Techs., LLC v. Lexmark Int'l, Inc., 2011 WL 6719725 (M.D. Fla. Dec. 21, 2011), or a lack of evidence that the damages were proximately caused by false marking), the Court is firmly convinced that the claim should not proceed to trial.

22

concludes that Plaintiffs have not shown they were prevented from entering the market of manufacturing and selling exercise equipment by Nautilus's false marking.

### 2.    Other Claimed Damages

As noted, Plaintiffs also allege that they have suffered a variety of other harms as a direct result of Nautilus's false marking. In particular, they contend they have devoted "unnecessary" expenses to: 1) attempting to license Nautilus patents; 2) attempting to purchase Nautilus patents or assets; 3) exploring the purchase of Med-X; 4) analyzing the validity of Nautilus patents; and 5) storing Nautilus machines Plaintiffs owned.[18]

For the same types of reasons discussed in the preceding section, none of these other alleged damages are competitive injuries. In short, Plaintiffs are neither competitors nor sufficiently close to competing to state a valid claim for "competitive injury"; it would require too much speculation on the part of any jury to designate any of these damages as a competitive injury.

These categories of alleged damages fail for additional reasons as well, and these additional reasons are equally applicable to the state law claims. First, as to the attempts to license, the attempts to purchase Nautilus patents, and the attempts to purchase Med-X, the Court has already explained that Plaintiffs undertook licensing and related efforts to obtain access to

---

[18] Although not listed as one of their claimed damages, Plaintiffs also complain that they "overpaid" for Nautilus machines that they thought were protected by patents but were not. To the extent Plaintiffs are claiming these as damages, the Court concludes that summary judgment is appropriate as to these alleged damages for two independent reasons. First, there is no evidence, based on anyone's personal knowledge, that the price of Nautilus machines was higher as a result of the patent labels affixed to them; instead, there is uncontroverted affidavit testimony that is not the case. See ECF No. 138-6, Murdock Decl. at ¶¶ 7-8. Second, even if there were such evidence, such damages would not constitute a competitive injury. See, e.g., Stauffer v. Brooks Bros., Inc., 2012 WL 6621374, *4 (S.D.N.Y. Dec. 19, 2012) (a competitive injury is one suffered as a defendant's competitor, not as its customer; thus, an allegation that deceptive marking practices "chilled competition and thus inflated the price plaintiff paid" for the product is not a competitive injury).

Nautilus technology only to use the machines in its planned centers. The licensing attempts, in particular, were part of an effort to settle pending litigation. This litigation was unrelated to any claims of false marking. Plaintiffs simply have not presented evidence from which a reasonable jury could find that these categories of costs incurred were caused by the false patent labels on the accused machines. Indeed, in his deposition, Sukumar appears to be attributing his belief that the machines were covered by patents at all to alleged oral representations by Nautilus regarding patent protection generally on its machines, but not by the false labels themselves. See, e.g., Sukumar Dep. at 110-11 (he felt that certain modifications to Nautilus machines already in his possession could involve him in a Nautilus patent infringement lawsuit "[b]ased on Greg Webb's and a whole host of other people from Nautilus telling him" that it could infringe Nautilus patents to make such modifications").

With regard to the storage fees and legal fees incurred in analyzing the validity of the patents, there is likewise no evidence that these expenses incurred were caused by the false marking. As to the "storage fees," the Court notes that Plaintiffs have changed the reason, over the course of various lawsuits, as to the alleged cause of those damages. That is, as noted and supported by Nautilus, see ECF No. 151 at 28-31, Sukumar has previously blamed other purported causes in seeking these precise damages, including Nautilus's breaches of contract or warranties. Indeed, in a filing with another court filed after this lawsuit, Sukumar claimed he incurred these storage fees as a result of Nautilus's breach of warranty. See ECF No. 151 at 30-31; 151-5 at 16.) Additionally, Sukumar testified that he continued to purchase Nautilus equipment—including the fifty machines purchased since 2005 despite believing he could not modify them—simply to "see what's the latest and greatest in the field of Nautilus." Sukumar Dep. at 147-48. If he believed he could not modify them, however, and consequently believed he

could not use them in his business, he cannot recover storage fees incurred for storing equipment he had no intention of using in his business. To allow recovery of that element of damages would be far afield from the direct causation required under both Section 292 and the state laws.[19] See, e.g., Kiwkset Corp. v. Superior Ct., 246 P.3d 877, 888 & n.9 (Cal. 2011) (to show causation under California's Unfair Competition Law in a case where there is an allegation of misrepresentation or deception, a plaintiff must demonstrate actual reliance on the deceptive statements and that the statement was "an immediate cause of the injury-producing conduct").

Similarly, as to whether Plaintiffs incurred "unnecessary" attorneys' fees, they contend (through the declaration of James Pampinella at 15) that the fees were for "work performed to determine the validity and enforceability of Nautilus's patents." Again, Plaintiffs have not shown how this is a competitive injury or affected their ability to compete. Instead, it seems that fees incurred in determining the validity of patents are a generic type of harm at best, and not proof here that Plaintiffs were competitively injured. Additionally, these fees were not "unnecessary" costs—they formed the basis of this lawsuit. With regard to the California statutes, moreover, attorneys' fees are not recoverable in such an action. See Cel-Tech Comms., Inc. v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 539 (Cal. 1999). Thus, to allow those same fees as an element of "damages" would do an end-run around that statute's prohibition on recovery of attorneys' fees.

All of the harms alleged here are simply too removed from the false patent labels to be a competitive injury—or any other type of direct injury—caused by the false labels. Other courts have held that such a speculative causal connection was insufficient to show a competitive

---

[19] Nautilus also points to Sukumar's acknowledgement that he placed and received another order of Nautilus machines about a year after he filed this lawsuit. The Court is constrained to agree with Nautilus that this fact shows Plaintiffs are purchasing Nautilus equipment for "their purposes—whatever that may be—regardless and irrespective of any patent labels or alleged 'deceit.'" ECF No. 138 at 48. While Plaintiffs' response claims they purchased these machines to investigate further false marking allegations against Nautilus, the cost of those machines and the cost of storing them cannot be deemed a competitive injury or an injury caused by the labels.

injury. In <u>Rogers v. Conair Corp.</u>, 2012 WL 1443905, *4 (E.D. Pa. Apr. 25, 2012), for example, the district court dismissed the plaintiff's false marking claim and specifically held that the complaint failed to allege any actual competitive injury. In particular, the plaintiff had not alleged any fact from which the Court could find "a plausible causal connection between [difficulties in his business, such as "difficulty obtaining retail shelf or selling his product"] and Conair's marking practices." <u>Id.</u> Other cases are in accord. <u>See, e.g.</u>, <u>Two Moms and a Toy, LLC v. Int'l Playthings, LLC</u>, 898 F. Supp. 2d 1213, 1217-18 (D. Colo. 2012) (rejecting false marking claim by a non-competitor because the plaintiff had not alleged an actual competitive injury, but only that it "could lose or could have already lost potential licensees"); <u>Advanced Cartridge Techs., LLC v. Lexmark Int'l, Inc.</u>, 2011 WL 6719725, at *3-5 (M.D. Fla. Dec. 21, 2011) (addressing competitive injury as one of three types of "standing" and concluding that a lack of direct harm precluded the plaintiff's claim as much as a lack of direct competition; also holding that even if plaintiff could prove lost licensing money because of false marking the harm would be "too derivative or indirect to support prudential standing"); <u>McCabe v. Floyd Rose Guitars</u>, 2012 WL 1409627 (S.D. Cal. Apr. 23, 2012) (dismissing claim because plaintiff failed to plead a competitive injury).

For the foregoing reasons, the Court will grant summary judgment in Nautilus's favor on Plaintiff's claim under 35 U.S.C. § 292.

## B.    State Law Claims

It is true that none of Plaintiffs' state law claims require a competitive injury, but they do all require damages caused by the mismarked labels. The Court explains the elements of each of the state law claims briefly below, but relies on its reasoning from Section A, <u>supra</u>, as to the lack of proof of causation. That is, for the same reasons that the Court has already explained,

26

Plaintiffs have failed to show that any of their claimed damages were caused by the false marking of the Nautilus machines and thus their state law claims all fail.

### 1. California Claims (Cal. Bus. & Prof. Code § 17500)

The California False Advertising Law ("FAL") makes it unlawful for an entity, with intent to dispose of real or personal property, to make or disseminate or cause to be disseminated, "any statement concerning that real or personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500 (West 2008). Similarly, California's Unfair Competition Law ("UCL") is violated by "any unlawful, unfair, or fraudulent business act or practice."

No damages are available under either the California FAL or the UCL to a private litigant. Only injunctive relief and non-mandatory restitution are available to a private litigant. See Pineda v. Bank of Am., N.A., 241 P.3d 870, 878-79 (Cal. 2010). To recover even these limited remedies, however, Plaintiffs must demonstrate causal injury, i.e., they must show either an "injury in fact" or "lost money or property" as a result of the false marking. Cal. Bus. & Prof. Code § 17204; id. at § 17535; see also Kwikset Corp., 246 P.3d at 885 (to satisfy standing under the FAL and UCL, a plaintiff must establish an economic injury that was caused by the "gravamen of the claim"); ECF No. 150 at 27 (Plaintiffs acknowledging same). Although Plaintiffs claim they have lost money as a result of Nautilus's false marking, the Court concludes that no reasonable jury could so conclude, for the reasons previously set forth.

## 2. Washington Consumer Protection Act Claim (Wash. Rev. Code § 19.86.020)[20]

Likewise, to recover under the Washington statute, Plaintiffs must demonstrate an injury to their business or property and "but for" causation, i.e., that, "but for the defendant's unfair or deceptive practice, the plaintiff[s] would not have suffered an injury." ECF No. 138 at 47 (quoting Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash, Inc., 170 P.3d 10, 22 (Wash. 2007); Goel v. Jain, 259 F. Supp. 2d 1128, 1142 (W.D. Wash. 2003) (setting forth elements of claim as including a showing that the unfair or deceptive act or practice caused injury to the plaintiffs' business or property). Again, for the reasons already discussed, none of the categories of damages claimed by Plaintiffs fairly can be said to have been caused by Nautilus's false patent labels.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 138, is **GRANTED** and Plaintiffs' Motion for Partial Summary Judgment, ECF No. 136, is **DENIED AS MOOT.** An appropriate Order shall issue this day.

**ENTER**: This 6th day of December, 2013.

_[signature]_
Senior United States District Judge

---

[20] As noted by the Court in its prior order, see ECF No. 103 at 16 n.7, the parties have not addressed in any detail whether or not the Washington statute is one of extraterritorial application. Because of its ruling that Plaintiffs have not established damages on this claim, the Court will assume without deciding that the Washington law is applicable here. But see Illinois Tool Works, Inc. v. Seattle Safety, LLC, 2010 WL 4668447, at *11-*12 (W.D. Wash. 2010) (rejecting claim where the plaintiff failed to show that the alleged violations affected the people of the state of Washington).

A00029

1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9             **CENTRAL DISTRICT OF CALIFORNIA**
10
11   PONANI SUKUMAR, et al,                    )   Case No. CV 10-07930 DMG (RZx)
                                               )
12                       Plaintiffs,           )   **ORDER RE DEFENDANT'S MOTION**
                                               )   **TO TRANSFER**
13            v.                               )
                                               )
14   NAUTILUS, INC.,                           )
                                               )
15                       Defendant.            )
                                               )
16   _____)
17

18        This matter is before the Court on Defendant's Motion to Transfer.  On May 6,
19   2011, the Court took the Motion under submission.  The Court deems this matter suitable
20   for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.  For the
21   reasons set forth below, Defendant's Motion to Transfer is GRANTED.

22                                       **I.**
23                          **PROCEDURAL HISTORY**
24        On October 21, 2010, Plaintiffs Ponani Sukumar and Southern California Stroke
25   Rehabilitation Associates, Inc. ("SCSRA") filed this *qui tam* action for false marketing
26   under 35 U.S.C. § 292 against Defendant Nautilus, Inc.  On March 24, 2011, Defendant
27   filed the Motion to Transfer [Doc. #20].  Plaintiffs filed their Opposition on April 25,
28   2011 [Doc. #27].  Defendant filed its Reply on May 2, 2011 [Doc. #31].

## II.

## **FACTUAL BACKGROUND**

In 2004, Plaintiff Sukumar formed Plaintiff SCSRA to help elderly patients suffering from neuromuscular dystrophies through a rehabilitation program that included customized cardiovascular, stretching, and strength training exercise machines. (Compl. ¶¶ 24-26.) Plaintiff Sukumar conducted an extensive search for exercise machines with specific characteristics, but ultimately determined that the marketplace did not offer an "off-the-shelf" medical grade product that would meet his needs. (*Id*. ¶¶ 26-27.)

Defendant formerly manufactured and distributed fitness and exercise equipment designed for heavy usage such as in fitness clubs, universities, YMCA/YWCA, hotels, and health centers. (Fish Decl. ¶¶ 2-11.) Plaintiff Sukumar found that machines manufactured by Defendant were best-suited for rehabilitation purposes but that they nonetheless needed modifications to meet the needs of the rehabilitation protocol that he had developed for the elderly. (Compl. ¶ 27.)

Plaintiff Sukumar believed that he could make the necessary design modifications himself. (*Id*. ¶ 28.) He had observed patent markings on Defendant's equipment, including patent-marking labels or plaques with many patent numbers, leading him to the conclusion that Defendant's technology was heavily protected by patents. Plaintiff Sukumar doubted that he was capable of designing around Defendant's many patents to create machines that did not infringe Defendant's rights. Consequently, Plaintiff Sukumar paid Defendant more than $150,000 to manufacture custom machines that implemented his designs. (*Id*. ¶ 29.)

This customized equipment did not meet Plaintiff Sukumar's expectations or the needs of SCSRA, forcing Plaintiffs to sue Defendant multiple times, at great cost, in an attempt to obtain machines that comply with Plaintiff's specifications. Throughout years of litigation, Plaintiff Sukumar has maintained his desire to specially design exercise equipment for SCSRA but has continued to be intimidated and deterred from doing so by the patent markings on Defendant's equipment. If not for these false and misleading

1  patent markings, Plaintiff Sukumar would have attempted to design and build machines
2  that suited his needs. (*Id.* ¶ 30.)

3      Plaintiffs assert that Defendant has falsely marked its products with patents that do
4  not cover the marked equipment and with expired patents. (*Id.* ¶¶ 39-75.) They claim
5  that Defendant has done so to prevent entry of its competitors into the market. (*Id.* ¶ 69.)

### III.

### <u>LEGAL STANDARD</u>

8      "For the convenience of parties and witnesses, in the interest of justice, a district
9  court may transfer any civil action to any other district or division where it might have
10  been brought." 28 U.S.C. § 1404(a). Adjudicating a motion to transfer under Section
11  1404(a) involves an "individualized, case-by-case consideration of convenience and
12  fairness." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (quoting
13  *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)).

14      Considerations that may be relevant to the transfer decision include (1) the location
15  where the relevant agreements were negotiated and executed; (2) the state that is most
16  familiar with the governing law; (3) the plaintiff's choice of forum; (4) the respective
17  parties' contacts with the forum; (5) the contacts relating to the plaintiff's cause of action
18  in the chosen forum; (6) the differences in the costs of litigation in the two fora; (7) the
19  availability of compulsory process to compel attendance of unwilling non-party
20  witnesses; and (8) the ease of access to sources of proof. *Jones*, 211 F.3d at 498-99
21  (citing *Stewart*, 487 U.S. at 29-31; *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987)).

### IV.

### <u>DISCUSSION</u>

24 **A.** **<u>Plaintiffs Could Have Brought This Suit In The Western District Of Virginia</u>**

25      Plaintiffs invoked federal jurisdiction on the grounds of diversity of citizenship.
26  Diversity would exist regardless of whether the case was filed here or in Virginia.
27  Because the case is nontransitory in nature, Plaintiffs could have filed it in the Western
28  District of Virginia.

**B.** **Transfer To The Western District Of Virginia Will Serve The Convenience Of The Parties And Witnesses As Well As The Interest Of Justice**

**1.** **The Location Where The Relevant Agreements Were Negotiated And Executed**

Because this is an action based on Defendant's alleged conduct rather than any contract between Plaintiffs and Defendant, this factor has no applicability.

**2.** **The State Most Familiar With The Governing Law**

This *qui tam* action is brought pursuant to 35 U.S.C. § 292. As Plaintiffs' claim arises under a federal statute, a Virginia district court will be equally familiar with the governing law.

**3.** **Plaintiffs' Choice Of Forum**

A plaintiff's choice of forum is only "one of several factors a court must consider when ruling on a motion to transfer venue." *Jacobson v. Hughes Aircraft Co.*, 105 F.3d 1288, 1302 (9th Cir. 1997), *rev'd on other grounds*, 525 U.S. 432, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *see also Stewart*, 487 U.S. at 31 ("[Section] 1404(a) accords broad discretion to [the] district court, and [a] plaintiff's choice of forum is only one relevant factor for its consideration." (construing *Norwood*, 349 U.S. at 32)); *cf. Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 665 (9th Cir. 2009) (noting that, even in the *forum non conveniens* context, the deference due a plaintiff's choice of home forum is "far from absolute"), *cert. denied*, 131 S.Ct. 645, 178 L.Ed.2d 479 (2009).

Here, Plaintiffs' choice of forum warrants far less than the usual amount of deference because Plaintiffs are suing on behalf of the United States. *See* 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3848 n.14 (3d ed. 2010) ("'[F]ederal district courts throughout the nation have held that, in *qui tam* actions, the plaintiff's choice of venue is not entitled to the same level of deference as in other actions' because the United States is the real plaintiff of interest." (quoting *United States ex rel. Roop v. Arkray USA, Inc.*, No. 1:04 CV 87-M-D, 2007 WL 844691 (N.D. Miss. Mar. 19, 2007)); *see also, e.g.*, *Clip Ventures LLC v. Suncast Corp.*,

No. C 10–04849 CRB, 2011 WL 839402, at *2 (N.D. Cal. Mar. 7, 2011) ("Though a plaintiff's choice of forum is usually entitled to deference, the weight of authority holds that this principle does not hold nearly as strongly when the plaintiff is a *qui tam* relator asserting the rights of the federal government." (citation omitted)); *Patent Mgmt. Found., LLC v. Analog Devices, Inc.*, No. C 10-03630 SBA, 2011 WL 197831, at *3 (N.D. Cal. Jan. 20, 2011) ("[F]ederal courts have ascribed little deference to a *qui tam* plaintiff's choice of forum."). Thus, in conducting the analysis under Section 1404(a), the Court does not give substantial weight to the fact that Plaintiffs chose this forum.

### 4. The Parties' Contacts With The Forum

There is no evidence in the record about the parties' forum-related contacts beyond those pertaining to the instant litigation. Plaintiff Sukumar is a California resident, Plaintiff SCSRA is a California corporation, and Defendant is a Washington corporation. Thus, it appears that this factor is neutral.

### 5. Contacts Relating To Plaintiffs' Cause Of Action In The Chosen Forum

Most of the contacts relating to this litigation occurred in Virginia where Defendant's former manufacturing plant and former employees reside. The equipment at issue in Plaintiffs' Complaint was primarily manufactured in Defendant's former plants in Independence, Virginia and Tulsa, Oklahoma. (Fish Decl. ¶ 13.) Most of the former employees at the Independence plant continue to work at the plant for Med-Fit Systems, which purchased Defendant's commercial division in February 2010. (*Id*. ¶¶ 10, 14.) Defendant did not maintain corporate offices or manufacture any equipment in the Central District of California. (*Id*. ¶ 13.)

Because all or nearly all of the contacts relating to Plaintiffs' cause of action occurred in Virginia, not California, this factor supports transfer.

### 6. Differences In Litigation Costs In The Two Fora

The parties do not submit evidence regarding litigation costs in California and Virginia. This factor is thus inconclusive.

**7. Availability Of Compulsory Process To Compel Attendance Of Unwilling Non-Party Witnesses**

"'[T]he relative ability of the forums to compel the attendance of significant unwilling witnesses at trial' is an important . . . factor." *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000) (quoting 17 James Wm. Moore et al., *Moore's Federal Practice* § 111.74[3][c][iii] (3d ed. 1997)) (evaluating the related doctrine of *forum non conveniens*). According to Defendant, the substantial majority of potential witnesses, including those with the most pertinent information relating to Plaintiffs' false marketing claims, are located in Virginia and are currently employees of Med-Fit Systems in Independence, Virginia. (Mot. at 16; Fish Decl. ¶¶ 11-14.)

In its Rule 26 initial disclosures, Defendant identified 30 potential witnesses, of whom 21 are known or believed to reside in the Western District of Virginia and one in the neighboring state of North Carolina.[1] (Kearns Decl. ¶ 4, Ex. A.) Of the remaining seven, three reside in Colorado, one resides in Utah, one resides in Oregon, and three are current employees of Defendant in Washington. (*Id.*) Plaintiffs identify no potential witnesses, other than Plaintiff Sukumar, living in the Central District of California. (*See* Kearns Decl. ¶ 6, Ex. B.)

It is unlikely that Defendant will need a court order to compel the attendance of its own employees at a trial in Virginia. Defendant will be extremely prejudiced if it cannot compel the testimony of its former employees in Virginia who were "involved with the manufacturing and marking of the products at issue" here. (Fish Decl. ¶ 11.) The other out-of-state witnesses are no more likely to appear in Los Angeles than Roanoke. Finally, Plaintiffs do not explain why employees of Med-Fit Systems would have relevant testimony. Med-Fit Systems is not a party to this action and it is not clear how it would have information about Defendant's former use of patents that Med-Fit Systems

---

[1] One of these potential witnesses, Gregory Webb, is also identified by Plaintiff as a potential witness. (Kearns Decl. ¶ 6, Ex. B) Plaintiff states that Mr. Webb works for Med-Fit Systems in Fallbrook, California (*id.*), which is located in the Southern District of California.

A00035

1  now owns that could not also be obtained directly from Defendant.  Accordingly, this

2  factor strongly favors transfer.

3       **8.**    **Ease Of Access To Sources Of Proof**

4      The crux of Plaintiffs' argument for keeping venue in the Central District of

5  California is that "Plaintiffs' key physical evidence in this case"—42 Nautilus strength

6  and cardio machines that Plaintiffs allege are falsely marked—reside in a warehouse in

7  this district.  (Cho Decl. ¶¶ 4-6.)  This argument is unpersuasive.  It is highly unlikely that

8  a jury would need to personally inspect these machines or that they would need to be

9  lodged with the court.  The only issue with respect to this evidence is whether or not the

10  machines are marked with patents and, if so, which patents.  As Plaintiffs themselves

11  demonstrate, this kind of evidentiary showing can be made through the use of

12  photographic exhibits.  (*See* Cho Decl., Ex. A (depicting images of several of the

13  machines at issue).)

14      Nonetheless, the parties may need to have experts examine the machines and it

15  might therefore prove more convenient if both the machines and the trial were held in the

16  same judicial district.  Thus, this factor weighs weakly against transfer.

17       **9.**    **Parallel Litigation**

18      The parties have a history of contentious litigation spanning more than a decade.

19  (*See* Kearns Decl. ¶¶ 7-23, Lodgments; Def.'s Request for Judicial Notice.)  Nonetheless,

20  it appears that none of this litigation directly concerns the subject matter of the instant

21  suit and, to the extent that it does, the other litigation has mostly been conducted in the

22  Southern District of California—none of it has occurred in Virginia.  Therefore, this

23  factor plays no role in the decision to transfer.

24      **10.**    **Balancing The Factors**

25      Considering all of the factors, it is clear that this litigation's only connection to the

26  Central District of California is Plaintiffs' residence here and their decision to have

27  several pieces of evidence deposited and stored here.  Only these facts and Plaintiffs'

28  choice of the Central District as a forum support keeping this action here.  The Court

1    does not find that Plaintiffs' choice of forum is entitled to much weight given that this is

2    a *qui tam* action with little else connecting it to the forum. In contrast, the potential

3    prejudice to Defendant from being unable to compel the testimony of the majority of

4    witnesses who reside in Virginia is a factor that strongly supports transfer. Accordingly,

5    the Court finds that the overall convenience of parties and witnesses as well as the

6    interest of justice are best served by transferring this action to the Western District of

7    Virginia.

8    **C.    <u>Plaintiffs' Remaining Contentions</u>**

9         Plaintiffs assert that Defendant unreasonably delayed filing the Motion to Transfer.

10   (Opp'n at 9-10.) Plaintiffs concede, however, that Defendant informed them within a

11   month after they filed this action that Defendant intended to file a motion to transfer this

12   matter to Virginia. (Tomasulo Decl. ¶ 14.) Shortly thereafter, the parties met and

13   conferred regarding the proposed motion. (*Id*.) Given that Plaintiffs had more than

14   sufficient notice, it is not clear how Plaintiffs are prejudiced by Defendant's delay in

15   filing the Motion by approximately four and one-half months. Trial is currently set for

16   April 17, 2012—more than 11 months away. Plaintiffs suggest that in the Western

17   District of Virginia they "could receive a much later trial date than this Court has

18   assigned." (Opp'n at 10.) Plaintiffs do not submit any evidence that the Western District

19   of Virginia's caseload would make such an occurrence likely. Even if, *arguendo*, transfer

20   would result in a delay, any prejudice to Plaintiffs is outweighed by the prejudice to

21   Defendant of being unable to compel witnesses if the case remains in this district.

22        Finally, Plaintiffs request that the Court delay ruling on the Motion to Transfer

23   until they have more time to conduct discovery. (Opp'n at 20-21.) As an initial matter,

24   this request undermines Plaintiffs' contention that Defendant's delay in filing the Motion

25   has caused them prejudice. In any event, Plaintiffs fail to show how additional discovery

26   would alter the transfer calculus. Although further discovery might show that some of

27   Defendant's potential Virginia witnesses do not in fact possess relevant information,

28

1  there are *no* potential witnesses in the Central District other than Plaintiff Sukumar.

2  Thus, postponing this decision until the parties conduct further discovery is unwarranted.

3  **V.**

4  **CONCLUSION**

5  In light of the foregoing, Defendant's Motion to Transfer is **GRANTED** and this

6  action is hereby **TRANSFERRED** to the United States District Court for the Western

7  District of Virginia, Roanoke Division.  In light of the transfer of the case, Plaintiffs'

8  Motion for Summary Judgment [Doc. # 30] is hereby **DENIED** without prejudice to its

9  re-filing in the appropriate forum.  The parties' request for an order on their Stipulation re

10 Briefing Schedule for Plaintiffs' Motion for Summary Judgment is **DENIED** as moot.

11 **IT IS SO ORDERED.**

12

13 DATED:     May 9, 2011

14                                                   DOLLY M. GEE
                                              UNITED STATES DISTRICT JUDGE

$$\mathfrak{United\ States\ Court\ of\ Appeals}$$
$$\mathfrak{for\ the\ Federal\ Circuit}$$

*Sukumar v. Nautilus, Inc.,* 2014-1205

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by WINSTON & STRAWN LLP, Attorneys for Appellants to print this document. I am an employee of Counsel Press.

On **April 18, 2014** counsel for Appellants has authorized me to electronically file the foregoing **Brief for Plaintiffs-Appellants** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Robert W. Harrison
Wilson, Elser, Moskowitz, Edelman
  & Dicker
655 West Broadway, Suite 900
San Diego, CA 92101
619-321-6200
robert.harrison@wilsonelser.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

April 18, 2014

/s/ Robyn Cocho
Counsel Press

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief was printed using a 14 point proportional Times New Roman font and contains 13,812 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).


Dated:  April 18, 2014                                    /s/  Geoffrey P. Eaton
                                                                         Geoffrey P. Eaton
                                                                         Counsel for Appellants